UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| IN RE: | Chapter 11 |
| DEATH'S DOOR SPIRITS, LLC, | Case No.: 18-13912 |
| DEATH'S DOOR DISTILLERY, LLC; | Case No.: 18-13915 |
| Debtors. | Joint Administration Pending |

AFFIDAVIT OF BRIAN ELLISON
IN SUPPORT OF FIRST DAY MOTIONS

STATE OF WISCONSIN )
                          ) ss.
COUNTY OF DANE )

I, Brian Ellison, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1. I am an adult resident of the State of Wisconsin and the President and founding member of Death's Door Spirits, LLC ("Spirits") and Death's Door Distillery, LLC ("Distillery"). Collectively, in this Declaration, I refer to Death's Door Spirits, LLC and Death's Door Distillery, LLC as the "Company" or as the "Debtors". Debtors are Wisconsin limited liability companies with their business headquarters all located in Middleton, Wisconsin.

2. In 2005, as a part of my employment at Vandewalle & Associates, I began working with farmers on Washington Island, Wisconsin, to grow crops that we would then find end products from the crops to produce and market. Through that process, we worked with many producers to try making different products. Wheat was the most successful crop grown. With the wheat, we produced a beer with Capital Brewery

and began exploring the idea of using the wheat from the Island to make vodka and local juniper to make gin. My employer, Brian Vandewalle, allowed me to attend classes and take company time to explore learning the process of distillation, and I found a contract distiller in Iowa that allowed us to begin producing Death's Door Vodka and Death's Door Gin in 2007.

3. The Death's Door brand took off quickly, but in the Spring of 2008, Vandewalle wanted me to return to working in economic development and to either sell off or abandon the Death's Door Spirits "project." Through almost a year of negotiation, I ended up acquiring the Death's Door assets from Vandewalle, ended my employment with the firm, and focused my full-time efforts on Death's Door Spirits, LLC beginning on May 19, 2009. Things moved quickly once I was able to focus full time on the brand. Death's Door was named Spirit of the Year in 2009 by *Wine and Spirit* Magazine and began national distribution with Serralles USA in 2011. In 2012, Death's Door opened its distillery in Middleton and in 2015 it was named the top selling domestic gin.

4. Currently, the Company includes five high-premium spirit brands, Death's Door Vodka, Death's Door Gin and Death's Door White Whiskey, Black Earth Bourbon and Wondermint, all of which use alcohol crafted in the mid-sized distillery in Middleton, Wisconsin. I actively manage the Company.

5. As a result of my active, day-to-day involvement with the Company, I am familiar with the operations, business affairs, and with the books and records of the Company, all of which are maintained in the ordinary course of business (the "Business Records") by me with the assistance of Company employees. Accordingly, except as otherwise indicated, I have personal knowledge of the matters set forth herein or have

gained knowledge of such matters from the employees and former employees of the Company. If called as a witness, I would testify competently to the facts set forth herein.

6. Distillery is a wholly owned subsidiary of Spirits. Originally, I owned all the interests in Spirits but, through a series of six offerings, the number of members in Spirits grew to sixteen by 2016. Currently, I own 35.23% of the interests in Spirits.

7. I am authorized to submit this Affidavit and Declaration (the "Ellison Declaration") on behalf of the Debtors in support of the Debtors' voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Debtors have filed and are requesting an expedited hearing with limited notice on the following motions (collectively, the Motion for Expedited Hearing and the following are referred to as the "First Day Motions"):

   a. Motion for Agreed Order Authorizing Use of Cash Collateral and Granting Adequate Protection;

   b. Motion to Pay Prepetition Employee Salaries and Wages, Benefits, And Other Employee Obligations, and Guaranteed Payments;

   c. Motion for Utility Procedures;

   d. Motion for Joint Administration and Establishing Single Shortened Service List;

   e. Motion for Two Orders: (1) Approving Sale Procedures, Form of the APA, Break-Up Fee and Scheduling Sale Approval; and (2) Authorizing Debtors to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances.

This Affidavit is offered in support of these First Day Motions and, even if not specifically restated in this Affidavit, I have reviewed the First Day Motions and the facts stated therein are true and correct to the best of my knowledge.

3

8. On the date of the filing of the First Day Motions (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Case").

9. Debtors are continuing in possession of their property and are operating and managing their businesses pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

10. No creditors' committee has been established, and a trustee has not been appointed in any of the Chapter 11 Cases.

11. As of the Petition Date, Debtors are engaged in distilling, marketing and selling spirits. Debtor's assets include cash, inventory, accounts receivable, equipment, intellectual property and some intangible assets, such as customer lists. Debtors have six (6) fulltime employees.

12. Debtors' secured creditors are the following:

    a. Debtors are indebted to Starion Financial pursuant to a Promissory Note dated May 31, 2013, in the original principal amount of $1,073,271.30. On the Petition Date, Debtors' owed Starion approximately $258,000. Debtors' obligations to Starion are secured by a first position, properly perfected, valid, and enforceable security interest in all personal property of Debtors, including but not limited to, all equipment, inventory, accounts, deposit accounts, and contract rights of Debtors, and proceeds thereof owned by Debtors and related to Debtors' operations as described in the security agreements executed by the Debtors, with the exception of the purchase money security interest of Margaret Ebeling, described below. Starion

4

      perfected its security interest by filing a UCC-1 Financing Statement with the Wisconsin Department of Financial Institutions on October 12, 2011, which it continued May 4, 2016.

  b.  Debtors are indebted to Margaret Ebeling pursuant to a Business Note in the amount of $35,000 dated September 12, 2018 and secured by a purchase money security interest in 28 barrels of whiskey (1555.64 proof gallons) and the products and proceeds of the same. Ebeling perfected her security interest by filing a UCC-1 Financing Statement with the Wisconsin Department of Financial Institutions on September 14, 2018. On the Petition Date, Debtors owed Ebeling approximately $35,000.

  c.  Debtors are indebted to Madison Gas & Electric ("MG&E") pursuant to a Shared Savings Agreement dated August 7, 2012 in the original amount of $395,000. MG&E claims a security interest in the Debtors' boilers. MG&E perfected its security interest by filing a UCC-1 Financing Statement with the Wisconsin Department of Financial Institutions on March 9, 2012. On the Petition Date, Debtor owed the MG&E approximately $190,000.

  d.  Debtors are indebted to Wisconsin Business Development Finance Corporation/the US Small Business Association (the "SBA") pursuant to the 504 Note dated May 28, 2013, in the original principal

amount of $1,364,000. The SBA claims a security interest in specific equipment and fixed assets. The SBA perfected its security interest by filing a UCC-1 Financing Statement with the Wisconsin Department of Financial Institutions on May 29, 2013. On the Petition Date, Debtor owed the SBA approximately $687,000.

13. Debtors' maximum volume is 140,000 proof gallons of spirits per year. However, Debtors have not reached close to that capacity since the distillery opened in 2012. Sales dropped more than 50% in 2015, and while they increased some in 2016 and 2017, Debtors have not operated the distillery at more than 40% capacity. Debtors' have tried to grow sales to rectify their cash flow problems that started in 2015, but they have never been able to do so. In 2017 and into 2018, Debtors' former distributor, Serralles USA was purchasing significant amounts of whiskey from Debtors each month and, when it stopped doing so in March, Debtors lacked the cash necessary to continue operations indefinitely. Then, effective as of October 31, 2018, Serralles USA terminated its distribution contract with the Company. The Company has entered into a new distribution agreement for some states and is selling independently in other states. However, the termination of the Serralles contract, together with the uncertainty in the distribution network going forward, put the Company in a dire cash flow situation and made the Case filing unavoidable.

14. Debtors have been marketing their assets for sale since early 2017. Originally, Debtors engaged Baker Tilly as an investment banker to find a buyer, but no buyers were found. As Debtors' financial problems intensified in 2018, Debtors began independently looking aggressively for a buyer with the capital necessary to

right-size and grow the operations and brand. Debtors have talked with more than 50 potential buyers and received 5 offers to purchase their assets in 2018.

15. Late in the summer of 2018, Debtors started talking with two specific potential buyers and, in October, after months of negotiations, one of those buyers entered into a Letter of Intent with Debtors. The potential buyer terminated the Letter of Intent within days.

16. Debtors were actively negotiating for the sale of their assets with three different parties in early November, and Debtors received two offers to purchase during that time. The higher of the two offers was from CDF Capital, LLC, the same party that terminated the letter of intent in October (the "Stalking Horse"). On November 21, 2018, Debtors finally entered into an Asset Purchase Agreement with the Stalking Horse, which contemplates and requires a sale through Chapter 11 of the Bankruptcy Code.

17. The Stalking Horse is not related to Debtors and is not a party in interest in this Case. The APA is a result of months of arms-length negotiations with the Stalking Horse.

18. Debtors have not been able to obtain bridge financing. Nonetheless, Debtors intend to operate in as robust a manner as possible inside of this Chapter 11 Case while they work through a sale process and close on the sale of their assets pursuant sale procedures set forth in the Asset Purchase Agreement with the Stalking Horse. After spending several years attempting to workout out of the Debtors' cash flow and capital issues and searching for inventors and, later, a buyer, in my best business judgment I believe that the Stalking Horse APA, a potential Auction and this

Case 3-18-13912-cjf   Doc 4   Filed 11/21/18   Entered 11/21/18 17:02:27   Desc Main
                       Document      Page 8 of 8

Case filing is the best way to maximize return to the Debtors' creditors and allow the operations and the brand to continue forward under new ownership.

19. In furtherance of the Debtors' objectives, Debtors have filed the First Day Motions and will propose orders (such orders being referred to herein as the "First Day Orders"). I have reviewed each of the First Day Motions, and the facts set forth therein are true and correct to the best of my knowledge, information, and belief, based upon my personal knowledge or the knowledge gained of such matters from the Debtors' and/or their employees or retained advisors. Moreover, I believe that the relief sought in each of the First Day Motions and First Day Orders is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their businesses or loss of productivity or value to close on the sale of their assets.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Brian Ellison

Subscribed and sworn to before me this
21 day of November, 2018.

_____
Print Name: Jamie L. Rose
Notary Public, State of Wisconsin
My Commission: 02/23/2022

*[Notary seal: JAMIE L. ROSE, NOTARY PUBLIC, STATE OF WISCONSIN]*