# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WISCONSIN

IN RE:                                              Chapter 11

DEATH'S DOOR SPIRITS, LLC,                          Case No.: 18-13912
DEATH'S DOOR DISTILLERY, LLC;                       Case No.: 18-13915

              Debtors.                  Joint Administration Pending

---

## MOTION FOR TWO ORDERS: (1) APPROVING SALE PROCEDURES, FORM OF THE APA, BREAK-UP FEE AND SCHEDULING SALE APPROVAL; AND (2) AUTHORIZING DEBTORS TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES

---

Death's Door Spirits, LLC and Death's Door Distillery, LLC (together, the "Debtors"), by their counsel DeMarb Brophy LLC, file this Motion for Two Orders: (1) Approving Sale Procedures, Form of the APA, Break-Up Fee and Scheduling Sale Approval; and (2) Authorizing Debtors to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances (the "Motion") in the above-captioned Chapter 11 Cases (the "Cases"). In support of the Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this proceeding is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      11 U.S.C. §§ 105(a), 363, 363(b), 363(f), 363(m), 541, and 554(a) and Fed. R. Bankr. P. 2002(a)(2), 4001, 6004 and 6004(h) authorize the relief requested in this Motion.

3.      To date, no previous request for the relief sought in this Motion has been requested.

## BACKGROUND

4.      On the date of this Motion (the "Petition Date"), the Debtors filed their Petitions for protection pursuant to Chapter 11 of the Bankruptcy Code.

5.      Debtors are continuing in possession of their property and operating and managing their businesses pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

6.      A creditors' committee has not been established and a trustee has not been appointed.

7.      Debtors distill and market for sale five high-premium spirit brands, Death's Door Vodka, Death's Door Gin and Death's Door White Whiskey, Black Earth Bourbon and Wondermint, all of which use alcohol crafted in the mid-sized distillery in Middleton, Wisconsin.

8.      Death's Door Spirits, LLC ("Spirits"), was formed in 2009 to hold the intellectual property of the "Death's Door" spirits brand.   In 2009, Death's Door Distillery, LLC, ("Distillery") was formed as the operating company when Debtors established the distillery located in Middleton, Wisconsin.   Distillery is a wholly owned subsidiary of Spirits.  Originally, Brian Ellison owned all the interests in Spirits but, through a series of six offerings, the number of members in Spirits grew to sixteen by 2016.  Currently, Brian Ellison owns 35.23% of the interests in Spirits.  Brian Ellison

is the President of and actively manages Debtors' operations.

9.    As of the Petition Date, Distillery employed six (6) people.  Its assets primarily include equipment, intellectual property, and inventory, along with a tax bond deposit in the amount of $150,000.00.

10.    Additional background information is contained in the Affidavit of Brian Ellison in Support of First Day Motions.

## BACKGROUND FOR RELIEF REQUESTED

11.    Debtors propose to sell substantially all of their assets, other than accounts receivables, (the "Property") pursuant to the terms of the attached Asset Purchase Agreement attached hereto as Exhibit A (the "APA") for the sum of $1,200,000.00 plus the Inventory Amount to CDF Capital, LLC ("CDF"), or a prevailing bidder at the Auction to be held pursuant to the Sale Procedures attached hereto as Exhibit B, as more fully set forth below.

12.    CDF is not related to Debtors and is not a creditor or party-in-interest in the Cases.

13.    Prior to the Petition Date, the Debtors engaged in the process of exploring a sale of some or all of their assets.  This process included identification of potential interested buyers for some or all of Debtors' Property.  In fact, Debtors have been marketing their assets for sale since early 2017.  Originally, Debtors engaged Baker Tilly as an investment banker to find a buyer, but no buyers were found.  As

Debtors' financial problems intensified in 2018, Debtors began independently looking aggressively for a buyer with the capital necessary to right-size and grow the operations and brand. Debtors have talked with more than 50 potential buyers and received 5 offers to purchase their assets in 2018.

14.    Late in the summer of 2018, Debtors started talking with two specific potential buyers and, in October, after months of negotiations, one of those buyers entered into a Letter of Intent with Debtors. The potential buyer terminated the Letter of Intent within days.

15.    Debtors were actively negotiating for the sale of their assets with three different strategic potential buyers in early November, and Debtors received two offers to purchase during that time, one of which was with CDF, the same party that terminated the Letter of Intent in October (the "Stalking Horse"). The offer from the Stalking Horse in November was the higher of the two offers Debtors received in November. On November 21, 2018, Debtors finally entered into the APA with the Stalking Horse, Exhibit A, which contemplates and requires a sale through Chapter 11 of the Bankruptcy Code.

## LIEN HOLDERS

16.    The proposed sale of the Property will be a sale free and clear of all liens, claims, interests and encumbrances. The following summarizes the nature, extent and amount of all such secured interests.

17.      Debtors are indebted to Starion Bank (f/k/a Starion Financial) pursuant to a Promissory Note dated May 31, 2013, in the original principal amount of $1,073,271.30. On the Petition Date, Debtors' owed Starion approximately $258,000. Debtors' obligations to Starion are secured by a first position, properly perfected, valid, and enforceable security interest in all personal property of Debtors, including but not limited to, all equipment, inventory, accounts, deposit accounts, and contract rights of Debtors, and proceeds thereof owned by Debtors and related to Debtors' operations as described in the security agreements executed by the Debtors, with the exception of the purchase money security interest of Margaret Ebeling, described below. Starion perfected its security interest by filing a UCC-1 Financing Statement with the Wisconsin Department of Financial Institutions on December 12, 2011, which it continued May 4, 2016. In cooperation with Starion, on the Petition Date, Debtors filed an Agreed Motion to Authorize Use of Cash Collateral and Grant Adequate Protection.

18.      Debtors are indebted to Margaret Ebeling pursuant to a Business Note in the amount of $35,000.00 dated September 12, 2018 and secured by a purchase money security interest in 28 barrels of whiskey (1555.64 proof gallons) and the products and proceeds of the same. Ebeling perfected her security interest by filing a UCC-1 Financing Statement with the Wisconsin Department of Financial Institutions on September 14, 2018. On the Petition Date, Debtor owed Ebeling approximately $35,000.00.

19.     Debtors are indebted to Madison Gas & Electric ("MG&E") pursuant to a Shared Savings Agreement dated August 7, 2012 in the original amount of $395,000. MG&E claims a security interest in the Debtors' boilers.  MG&E perfected its security interest by filing a UCC-1 Financing Statement with the Wisconsin Department of Financial Institutions on March 9, 2012.  On the Petition Date, Debtor owed the MG&E approximately $190,000.00.

20.     Debtors are indebted to Wisconsin Business Development Finance Corporation/the US Small Business Association (the "SBA") pursuant to the 504 Note dated May 28, 2013, in the original principal amount of $1,364,000.  The SBA claims a security interest in specific equipment and fixed assets.  The SBA perfected its security interest by filing a UCC-1 Financing Statement with the Wisconsin Department of Financial Institutions on May 29, 2013.  On the Petition Date, Debtor owed the SBA approximately $687,000.00.

## SALE PROCEDURES AND AUCTION

21.     The APA requires specific sale procedures attached hereto as Exhibit B (the "Sale Procedures").  Debtors request that the Court schedule a hearing to approve the Sale Procedures as quickly as possible (the "Sale Procedures Hearing").  At the Sale Procedures Hearing, Debtors request that the Court enter an order approving the Sale Procedures, approving the break-up fee, described below, and the form of the APA, and scheduling the Sale Approval Hearing.  Through this Motion and at the

Sale Approval Hearing, Debtors request that the Court approve the Sale to the Stalking Horse pursuant to the APA, or to the Prevailing Bidder after the Auction pursuant to the Prevailing Bid.

22.     The sale pursuant to the APA is with limited warranties and representations and the APA requires the entry of an order from this Court approving the sale of the Property to CDF, free and clear of liens, claims and encumbrances.

23.     If any party who is qualified under the Sale Procedures presents a Competing Offer on or before 24-hours before the time the Court sets for the Sale Approval Hearing (the "Submittal Deadline"), Debtors will hold an Auction for the Property pursuant to the Sale Procedures.  The Auction, if any, will take place before the Sale Approval Hearing, and at the Sale Approval Hearing, Debtors will ask this Court to approve the highest and best bid for the Property.

24.     The APA requires a closing on the sale of the Property no later than December 31, 2018.  The Cash Collateral Order requires sale approval of the APA, or a higher and better offer at Auction, by December 19, 2018.

25.     The APA that Debtors request that the Court approve (i) a break-up fee of $50,000.00 payable to CDF if CDF is not the ultimate purchaser of the Property; and (ii)  an expense reimbursement of for expenses incurred by CDF in connection with due diligence and with respect to the preparation of negotiating and executing the APA in an amount equal to (i) $40,000.00 if the Auction occurs on or prior to

December 24, 2018 and (ii) $60,000.00 if the Auction occurs after December 24, 2018.

26.     Within two (2) business days of the entry of the Sale Procedures Order, Debtors will e-mail copies of the Motion, including the exhibits, to all parties with whom Debtors have discussed a possible sale in the last 12-months ("Debtors' List"). In addition, Debtors are requesting authority to pay any business broker or investment banker who represents a Prevailing Bidder (a) that becomes the ultimate buyer of the Property; and (b) is not the Stalking Horse or a party related to the Stalking Horse, the sum of $50,000.00 from the net sale proceeds.  Given the Initial Overbid amount structure required by the APA and included in the Sale Procedures, paying a buyer's commission of $50,000.00 to such a broker would be in the best interests of the Debtors' estates.

27.     The terms of the APA are summarized in this Motion and a copy of the APA is attached as Exhibit A to the Motion filed with the Court.  If creditors or other interested parties have any questions, know of any potential for marketing the Assets to obtain a higher Purchase Price, would like additional information on the APA or a copy of the APA, such parties should contact Debtors' counsel.  Debtors' counsel will provide a copy of the APA to such parties promptly.

## SALE OF THE PROPERTY FREE AND CLEAR OF LIENS

28.     Debtors are requesting that the Court approve the sale of the Property pursuant to the APA, or any offer made pursuant to the Sale Procedures that is higher

8

and better than the APA, free and clear of all pre-existing interests, liens, claims and encumbrances of any kind and any nature.

29.    In accordance with Section 363(f) of the Code, a debtor-in-possession may sell property under Section 363, ". . . free and clear of any interest in such property of an entity other than the estate. . ." if one of the following conditions is satisfied:

(1)    Applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(2)    Such entity consents;

(3)    Such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    Such interest is in *bona fide* dispute; or

(5)    Such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

30.    Because Debtors expect they will satisfy one or more of the requirements of Section 363(f), as will be demonstrated at the Sale Approval Hearing, the approval of the sale of the Property free and clear of all interests is warranted.

31.    Starion consents to the sale and, indeed, the proposed Cash Collateral Order requires the Sale.  Debtors do not believe that the other secured creditors will object to the Sale.

32.    The net proceeds will be deposited in the Debtors' account to be held with other funds on deposit and collection of accounts receivable to be disbursed pursuant to further orders of this Court.

33.    Accordingly, Debtors request that the order approving the sale of the assets provide that such sale is free and clear of all liens, claims and encumbrances in accordance with Section 363(f) of the Code.

**WHEREFORE,** Debtors respectfully request that the Court enter an order:

A.    Approving the Sale Procedures, approving the form of the APA, and scheduling a Sale Approval Hearing;

B.    Authorizing Debtors to sell the Property, as more specifically described in the attached Exhibit A to CDF or to a Prevailing Bidder at an Auction, if any, free and clear of all liens, claims, interests and encumbrances including, without limitation, the liens of secured creditors, which liens, claims, interests and encumbrances will attach to the proceeds of sale in the same order and priority that existed at the commencement of the Cases;

C.    Approving (i) a breakup fee of $50,000.00 payable to CDF if it is not the ultimate purchaser of the Property; and (ii) an expense reimbursement of for expenses incurred by CDF in connection with due diligence and with respect to the preparation of negotiating and executing the APA in an amount equal to (i) $40,000.00 if the Auction occurs on or prior to December 24, 2018 and (ii) $60,000.00 if the Auction occurs after December 24, 2018.

D.     Granting Debtors the authority to pay any business broker or investment

banker who represents a Prevailing Bidder (a) that becomes the ultimate

buyer of the Property; and (b) is not the Stalking Horse or a party related

to the Stalking Horse, the sum of $50,000.00 from the net sale proceeds.

E.     Granting such other and further relief as the Court may deem just and

equitable.

Dated this 21st of November, 2018.

**DEMARB BROPHY LLC**
Proposed Counsel for Debtors

By: _____
      Rebecca R. DeMarb
      WI State Bar No. 1026221
      rdemarb@demarb-brophy.com
      One North Pinckney Street, Suite 300
      Madison, WI 53703
      Phone: (608) 310-5500

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "**Agreement**") is made and entered into as of November 21, 2018 by and among: (i) Death's Door Distillery, LLC ("**Distillery**"), Death's Door Spirits, LLC ("**Spirits**"), both Wisconsin limited liability companies with their principal offices located at 2220 Eagle Drive, Middleton, Wisconsin 53562 (Distillery and Spirits, together, are called interchangeably "**Seller**" and "**Sellers**" in this document, and "Seller" and "Sellers" should be read to mean both Distillery and Spirits); and ,CDF Capital, LLC, a Delaware limited liability company, with its principal offices located at 528 West Wrightwood, Chicago, IL 60614 and/or a new entity formed for the purpose of acquiring the Acquired Assets as defined herein (collectively, the "**Buyer**").

## W I T N E S S E T H:

WHEREAS, Sellers are in the business of distilling and marketing spirits including gin, vodka and whiskey branded as "Death's Door" (the "**Business**") from their offices located at 2220 Eagle Drive, Middleton, Wisconsin 53562 (the "**Premises**");

WHEREAS, Sellers desire to sell, assign, transfer and convey to Buyer, and Buyer desires to purchase and acquire from Sellers, on the terms and subject to the conditions set forth in this Agreement, substantially all of Sellers' assets, rights and interests relating to the Business in consideration of certain payments by Buyer; and

WHEREAS, Sellers intend to file a Chapter 11 Bankruptcy Case in the Western District of Wisconsin (the "**Case**");

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinafter contained and other good and valuable consideration, Buyer and Sellers hereby agree as follows:

## ARTICLE I.  PURCHASE AND SALE OF ASSETS

1.1    **Sale and Transfer of Assets**. Subject to the terms and conditions set forth herein, at the closing of the sale (the "**Closing**"), Buyer shall purchase and acquire from Sellers, and Sellers shall sell, assign, transfer, convey and deliver to Buyer, free and clear of any and all liens, claims, and encumbrances (collectively, "**Liens**"), all of Sellers' right, title and interest in, to and under, the assets, rights and interests owned, used, occupied or held by or for the benefit of Sellers in the operation of or otherwise relating to the Business, other than the Retained Assets (defined below) and other than the assets used exclusively by and for the Kringle Cream spirits line (the "**Kringle Cream Assets**"), wherever such assets, rights and interests may be situated and as the same shall exist as of the Closing Date (defined below), including the following (collectively, the "**Acquired Assets**"):

(a)    Inventory. All inventories including, without limitation, the inventory listed on **Schedule 1.1(a)** attached hereto ("**Inventory**"), along with the location of all such Inventory;



Ex. A

(b)     Telephone Numbers. All assignable rights and privileges of Sellers to the telephone numbers, facsimile number and internet-based advertising used in the operation of the Business;

(c)     Intellectual Property Rights. All Intellectual Property Assets, including its tradenames, including without limitation "Death's Door" and any other similar or derivative names used by Sellers in the Business, Sellers' URL and websites: [https://www.deathsdoorspirits.com] (it being understood and agreed that the Kringle Cream Assets shall not include any assets or rights related to the "Death's Door" brand, trademark or intellectual property);

(d)     Business Records. All business books and records relating to the Business that have been reduced to writing or stored electronically or otherwise; and

(e)     Rights under Warranties. All rights, claims and benefits of Sellers in, to and under any indemnities or express or implied warranties from the suppliers of goods or services relating to the Business, including any coverage rights under product Liability or other insurance maintained by any of such suppliers for the benefit of Sellers, to the extent assignable;

(f)     Tax Bond Deposit. All rights to any cash or deposit that have been posted with respect to the Seller's tax bond obligations (the "**Tax Bond Deposit**"); and

(g)     Equipment. All equipment, including without limitation, the equipment, parts and supplies relating to the Business listed on **Schedule 1.1(g)** which shall be delivered within five (5) business days after the date hereof.

**1.2     Retained Assets**. Anything in **Section 1.1** to the contrary notwithstanding, the following assets (collectively, "**Retained Assets**") shall be retained by Sellers, and Buyer shall in no way be deemed to have purchased or acquired (or to be obligated to purchase or acquire) any interest whatsoever in any of the following:

(a)     Personal items. Those personal items belonging to the owners and employees of Sellers listed in **Schedule 1.2(a)** attached hereto;

(b)     Corporate Records. Sellers' minute books, stock transfer books and stock ledger and corporate seal;

(c)     Refunds. Except with regard to customer, vendor and supplier refunds due to the Business, if any, all refunds or returned deposits to which Sellers is entitled to receive;

(d)     Bank Accounts. All of Sellers' title and interest in and rights with respect to deposit accounts listed on **Schedule 1.2(d)**, and all cash and other property contained therein;

2

(e)    <u>Cash and Accounts Receivable</u>. All of Sellers' other cash (other than the Tax Bond Deposit) and all of Sellers' right, title and interest in and to all accounts receivable associated with the Business, which accounts receivable are set forth on **Schedule 1.2(e)** attached hereto; and

(f)    <u>Prepaid Health Insurance</u>. Prepaid employee health insurance premiums.

**1.3    Bankruptcy or Receivership**.    This Agreement is being executed in connection with the Sellers filing a Chapter 11 Bankruptcy Case (a "**Case**") and this transaction will be subject to Court approval in a motion to be filed pursuant to 11 U.S.C. § 363, as set forth in Article VIII, below. In a Case, Sellers will request that the Court enter an order providing for the sale of the Acquired Assets to Buyer pursuant to Court order, free and clear of liens, claims and encumbrances, using the procedure set forth in detail in the Sale Procedures included in Article VIII.

## ARTICLE II.  LEASE ASSUMPTION

**2.1**    Buyer shall either (i) accept an assignment of Seller's existing leases (the "**Existing Leases**") pursuant to 11 U.S.C. § 365; or (ii) execute new lease agreements with the Seller's existing landlords with respect to premises located at 2220 Eagle Drive, Middleton, Wisconsin 53562 and the bonded warehouse located at 5729 Whipporwill Road, Berry, Wisconsin (the "**Premises**"). To the extent, the Buyer enters into new lease agreements, Buyer shall use commercially reasonable efforts to obtain a release from such landlords which releases the Sellers from any and all obligations under the Existing Leases (such release and new lease collectively referred to herein as a "**New Leases**").

## ARTICLE III.  PURCHASE PRICE

**3.1    Purchase Price**. Subject to the terms and conditions of this Agreement, the total purchase price payable by Buyer in full consideration for the purchase, sale and transfer of the Acquired Assets (the *"***Purchase Price***"*) a cash payment at Closing of an amount equal to (i) $700,000; <u>plus</u> (ii) the Inventory Amount at Closing, calculated as set forth below.  Seller shall apply the Earnest Money <u>that </u>Buyer has escrowed pursuant to **Section 3.3** below to the Purchase Price.

(a)    **Schedule 1.1(a)** sets for the Inventory held by Seller on or about the date of this Agreement.  As stated on Schedule 1.1(a), the cost value of the Inventory is $915,521 (the "**Target**"), and Buyer is allocating $500,000 in value to the Inventory (the "**Initial Inventory Allocation Amount**").

(b)    The parties shall conduct an inventory the day before the Closing and through that inventory process, the parties will update **Schedule 1.1(a)** to the actual inventory quantities on the day before Closing, and updated **Schedule 1.1(a)** will set forth the extended cost of the Inventory (the "**Actual Inventory at Cost**").  The Buyer shall have the opportunity to have a representative present with the Seller as the Seller takes inventory.  The updated Schedule 1.1(a) prepared by the Seller will include changes in

3

inventory quantities, in accordance with the form and substance set out in **Schedule 1.1(a)** hereto.

      (c)    The Actual Inventory at Cost divided by the Target is the "**Inventory Ratio**". The Inventory Amount includable in the final adjusted Purchase Price shall be equal to the lesser of (X) the result of multiplying the Initial Allocation Amount of $500,000 by the Inventory Ratio; and (Y) $500,000.

      (d)    For illustrative purposes only, if the Actual Inventory at Cost is $700,000, then the Inventory Ratio would be 76.459% and the Inventory Amount would be $382,295.98.

    **3.2**    **Purchase Price Allocation.** The Purchase Price shall be allocated by Buyer and Sellers in the manner required by Section 1060 of the Code and the U.S. Treasury Regulations promulgated thereunder (and any similar provision of state or local law, as applicable). Buyer and Sellers shall file any related tax forms required by the Internal Revenue Service (including IRS Form 8594), and any other taxing authority, consistent with the principals of Code Section 1060, the U.S. Treasury Regulations promulgated thereunder and the instructions to IRS Form 8594.

    **3.3**    **Earnest Money.** Prior to 5:00 p.m. (central standard time) on November 28th, 2018, Buyer agrees to deliver to Sellers' legal counsel DeMarb Brophy LLC, by wire transfer or certified check, the sum of $50,000.00 as a deposit (the "**Earnest Money**"), which Earnest Money shall be non-refundable unless (i) the Seller fails to satisfy the closing deliveries required under **Section 4.1**, or (ii) the Seller accepts a Prevailing Bid from a Prevailing Bidder (other than Buyer). In the event the sale of the Acquired Assets is consummated, the Earnest Money shall be applied to the Purchase Price. If Buyer has the right to terminate this Agreement and does so or the Agreement terminates for any reason under the terms and in the manner specified in this Agreement, other than by Buyer's default of its obligations hereunder, Buyer shall provide written notice of cancellation to Sellers and Sellers' legal counsel. Revocation of this Agreement by Buyer while the court approval process, described below, is pending shall constitute a default by Buyer for purposes of forfeiting the Earnest Money. Within five (5) business days of receipt of the notice of cancellation, Sellers may provide written notice to Buyer disputing cancellation of this Agreement. If the Buyer does not receive written notice of any dispute during the five-day period, Sellers' legal counsel shall release the Earnest Money to Buyer and neither party shall have any further obligation, right or remedy against the other party under the Agreement. Following receipt of approval by the Bankruptcy Court, if Buyer fails to consummate this transaction at the Closing, other than on account of Sellers' default, Sellers shall be entitled to retain the Earnest Money as liquidated damages and forfeiture of the Earnest Money shall be the Sellers' sole recourse with respect to any dames or relief sought from the Buyer.

## ARTICLE IV. CLOSING

    **4.1**    **General**. The closing of the sale of the Acquired Assets to Buyer as provided herein shall take place on or before December 31, 2018, or such other date as Buyer and Sellers mutually agree (the "**Closing Date**"), simultaneously with the execution and delivery of the documents and instruments referred to in **Section 4.2** and **Section 4.3** and subject to the conditions set forth in

4

**Section 4.4** (the "**Closing**"). Legal and equitable title with respect to the Acquired Assets shall be deemed to pass to Buyer, and the transfer of the Acquired Assets from Sellers to Buyer shall be deemed effective for tax, accounting and other computational purposes, as of 11:59 p.m. (local time) on the Closing Date.

    **4.2**    **Documents to Be Delivered by Sellers**. At the Closing, Sellers shall deliver or cause to be delivered to Buyer:

        (a)    a bill of sale in form and substance satisfactory to Buyer, duly executed by Sellers, transferring the tangible personal property included in the Acquired Assets from Sellers to Buyer;

        (b)    assignments in form and substance satisfactory to Buyer (the "**Intellectual Property Assignments**"), duly executed by Sellers, transferring all of Sellers' right, title and interest in and to the Intellectual Property to Buyer;

        (c)    true and complete copies of all resolutions adopted by the board of directors and shareholders of Sellers authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby (the "**Sellers' Resolutions**");

        (d)    a copy of the Sale Approval Order entered in the Case authorizing the transfer of the Acquired Assets to Buyer free and clear of liens, claims and encumbrances or all duly executed Consents, if any, in forms acceptable to Buyer;

        (e)    a certificate, dated the Closing Date and signed by a duly authorized officer of Sellers, that each of the conditions set forth in **Section 4.4** have been satisfied (the "**Sellers' Closing Certificate**");

        (f)    the Settlement Statement, executed by Sellers;

        (g)    an updated **Schedule 1.1(a)** which contains the Actual Inventory at Cost;

        (h)    all other Transaction Documents, if any, duly executed by the parties thereto, and such other documents, instruments, certificates as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement, including any deeds, bills of sale, endorsements, assignments and other instruments of sale, assignment, transfer and conveyance in form and substance satisfactory to Buyer and its counsel, as are required to consummate the transactions contemplated by this Agreement;

        (i)    if necessary as part of the transition to full operations by Buyer post-closing, a signed management agreement between Buyer and Seller on commercially reasonable terms, which the parties intend to reimburse Seller for Seller's actual costs plus a modest management fee, in form and substance to be agreed upon between the parties;

(a)     written letters of authorization or confirmation from the Seller to all relevant national, federal and state alcoholic beverage authorities (including the U.S. Alcohol and Tobacco Tax and Trade Bureau) that the Buyer or its designee is authorized by the Seller to use bottles, pre-printed bottling labels, shipping cartons and advertising and promotional material and trade dress thereon included in the Acquired Assets that refer to any corporate or trade name of the Seller or any of its affiliates;

(j)     satisfactory evidence that the equipment listed on **Schedule 1(g)** has been delivered in the condition it existed on the date of this Agreement without deviation in excess of $10,000; and

(k)     all keys and any other items necessary for the Buyer to secure access and control over the Premises.

**4.3     Documents to Be Delivered by Buyer**. At the Closing, Buyer shall deliver or cause to be delivered to Sellers:

(a)     The Purchase Price;

(b)     the Intellectual Property Assignments, duly executed by Buyer;

(c)     true and complete copies of all resolutions adopted by the board of directors of Buyer authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents to which Buyer is a party and the consummation of the transactions contemplated hereby and thereby (the "Buyer Resolutions");

(d)     a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in Section 4.5 have been satisfied (the "Buyer Closing Certificate");

(e)     the Settlement Statement, duly executed by Buyer;

(f)     a New Lease or an assignment and assumption of the Existing Lease; and

(g)     all other Transaction Documents, if any, duly executed by the parties thereto, and such other documents, instruments, certificates as Sellers reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement; and

(h)     if necessary as part of the transition to full operations by Buyer post-closing, a signed management agreement between Buyer and Seller on commercially reasonable terms, which the parties intend to reimburse Seller for Seller's actual costs plus a modest management fee, in form and substance to be agreed upon between the parties.

**4.4     Conditions Precedent to Buyer's Obligations**. The obligations of Buyer under this Agreement, including the obligation to consummate the transactions contemplated hereby,

6

shall be subject to the satisfaction of the following conditions or the waiver thereof by Buyer in its sole and absolute discretion:

(a)    execution and delivery of the documents set forth in Section 4.2, above, including the entry of the Sale Approval Order;

(b)    the representations and warranties of Sellers contained in this Agreement and any certificate or other writing delivered pursuant hereto or thereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects);

(c)    each Sellers shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by such Sellers prior to or on the Closing Date; provided, that, with respect to agreements, covenants and conditions that are qualified by materiality, Sellers shall have performed such agreements, covenants and conditions, as so qualified, in all respects; and

(d)    no Action shall have been commenced against Buyer or Sellers which would prevent the Closing, and no injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

**4.5    Conditions Precedent to Sellers' Obligations**. The obligation of Sellers under this Agreement to consummate the transactions contemplated hereby shall be subject to the satisfaction of the following conditions or the waiver thereof by Sellers in its sole and absolute discretion:

(a)    execution and delivery of the documents set forth in Section 4.3 above, including the entry of the Sale Approval Order;

(b)    the representations and warranties of Buyer contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto or thereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects);

7

(c)     Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by Buyer prior to or on the Closing Date; provided, that, with respect to agreements, covenants and conditions that are qualified by materiality, Buyer shall have performed such agreements, covenants and conditions, as so qualified, in all respects; and

(d)     no Action shall have been commenced against Buyer or Sellers which would prevent the Closing, and no injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

**4.6     Effect of Closing**. Upon the consummation of the Closing: (i) Buyer shall have acquired full ownership of, and control and authority over, and liability for, the Acquired Assets, and the operation of the Business represented by the Acquired Assets, and shall possess the unrestricted power to make all policy, operational and strategic decisions with respect thereto; and (ii) Sellers shall retain full ownership of, and control and authority over, and liability for, the Retained Assets and the Retained Liabilities. Nothing in this Agreement (including, without limitation, the Buyer's obligations under **Section 3**) or any other Transaction Document shall be construed or deemed to limit or restrict in any way Buyer's ability to operate and manage the Acquired Assets and the Business after the Closing in the manner in which Buyer believes to be the most efficient, profitable and strategically desirable for Buyer and its shareholders in Buyer's sole and absolute discretion.

## ARTICLE V.  REPRESENTATIONS AND WARRANTIES

**5.1     Representations and Warranties of Sellers**. Subject only to those exceptions and qualifications listed and described on the Schedules attached to this Agreement, Sellers hereby represent and warrant to Buyer that, unless otherwise indicated, as of the date hereof and as of the Closing Date:

(a)     Organization and Standing; Power and Authority. Sellers are limited liability companies duly organized, validly existing and in good standing under the laws of the State of Wisconsin and have full corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by them and to carry on the Business as it has been and currently is being conducted, and, subject to Court approval in a Case, to enter into and perform this Agreement and the transactions and other agreements and instruments contemplated by this Agreement. This Agreement and the transactions and other agreements and instruments contemplated hereby have been duly approved by Sellers' boards of directors and members, as necessary.

(b)     Acquired Assets; Title to Acquired Assets. Except for the Retained Assets, the Acquired Assets are the only assets, properties, rights and interests used by Sellers in connection with the Business. The Acquired Assets constitute all of the assets, properties, rights and interests necessary to conduct the Business in substantially the same manner as conducted by Sellers prior to the Closing Date. None of the Retained Assets are material

8

to the Business. All of the Acquired Assets are the same or materially similar operating condition and repair as they were on the date hereof and are adequate and sufficient for the uses to which they are put in the Business. Subject to Court approval in a Case, Sellers have good, marketable and exclusive title to, and the valid and enforceable power and unqualified right to use and transfer to Buyer, each of the Acquired Assets and the Acquired Assets are free and clear of all Liens and other claims of any kind and nature whatsoever pursuant to Order to be entered in the Case.

**5.2    Representations and Warranties of Buyer.** Buyer represents and warrants to Sellers that, as of the date hereof and as of the Closing Date:

(a)    <u>Organization and Standing; Power and Authority</u>. Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has full corporate power and authority to enter into and perform this Agreement and the transactions and other agreements and instruments contemplated by this Agreement. This Agreement and each of the other Transaction Documents to which Buyer is a party have been (or, upon execution thereof, will be) duly executed and delivered by, and constitute (or, upon execution thereof, will constitute) the valid and binding obligations of Buyer, enforceable in accordance with their respective terms.

(b)    <u>Conflicts and Defaults</u>. Neither the execution and delivery of this Agreement and other Transaction Documents by Buyer nor the performance by Buyer of its obligations hereunder and thereunder will (i) violate, conflict with, or constitute a default under, any provision of Buyer's articles of incorporation or bylaws or any provisions of, or result in the acceleration of any obligation under, any contract, sales commitment, license, purchase order, security agreement, mortgage, note, deed, lien, lease, agreement or instrument, or any Law by which Buyer is bound or (ii) constitute an event that, after notice or lapse of time or otherwise, would result in any such violation, conflict, default (except defaults that would not individually or in the aggregate have a Material Adverse Effect), acceleration, or creation or imposition of Liens or other claims.

(c)    <u>Brokers, Finders and Agents</u>. Buyer is not directly or indirectly obligated to anyone as a broker, finder or in any other similar capacity in connection with this Agreement or the transactions contemplated hereby.

(d)    <u>Ability to Close</u>. Buyer has the cash on hand or has the ability to access all necessary cash resources, to close the transaction provided for in this Agreement.

<u>**ARTICLE VI.  COVENANTS OF SELLERS**</u>

**6.1    Conduct and Transition of Business**. From the date hereof until the Closing, except as otherwise provided in this Agreement, required by Chapter 11 of the Bankruptcy Code, required by the Court in a Case, or consented to in writing by Buyer, Sellers shall (a) conduct the Business in the ordinary and normal course of business consistent with past practice; and (b) use reasonable best efforts to maintain and preserve intact its current Business organization, operations and franchise and to preserve the rights, franchises, goodwill and relationships of its employees,

9

customers, lenders, suppliers, regulators and others having relationships with Sellers or the Business. Without limiting the foregoing, from the date hereof until the Closing, Sellers shall: (i) preserve and maintain all Permits required for the conduct of the Business as currently conducted or the ownership and use of the Acquired Assets; (ii) pay the debts, Taxes and other obligations of the Business when due; (iii) continue to collect accounts receivable in a manner consistent with past practice, without discounting such accounts receivable; (iv) maintain the properties and assets included in the Acquired Assets in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear; (v) continue in full force and effect without modification all insurance policies, except as required by applicable Law; (vi) defend and protect the properties and assets included in the Acquired Assets from infringement or usurpation; perform all of its obligations under all Assigned Contracts; (vii) maintain the books and records of the Business in the ordinary course of business and consistent with past practice; and (viii) comply in all material respects with all Laws applicable to the conduct of the Business or the ownership and use of the Acquired Assets. In addition, Sellers shall cooperate with Buyer in the transition of Sellers' Business to Buyer and shall undertake all actions in connection therewith reasonably requested by Buyer from the date of this Agreement for a period of at least thirty (30) days following the Closing Date.

**6.2    Employment Matters.** Unless otherwise agreed by Sellers and Buyer, or required by the Court in the Case, Sellers shall terminate all employees associated with the Business, effective immediately prior to Closing. Immediately after Closing, Buyer shall be free to offer employment to such of Sellers' employees as Buyer may choose, on terms and conditions to be established by Buyer in its discretion, and Sellers shall cooperate in Buyer's hiring of such employees. Sellers shall allow Buyer reasonable access to all employees at the Premises to interview such employees. Buyer shall be permitted, during the period commencing on the Effective Date and ending on the earlier to occur of the Closing Date or such other date that this Agreement is terminated in accordance with its terms, to have access to and the right to interview all employees involved in the operation of the Business. For any employee so employed by Buyer, Buyer shall not be liable for any benefits of any kind or nature accrued by the employee for any services rendered to Sellers or otherwise arising on or before the Closing Date, including but not limited to any obligations associated with any employee benefit plans, vacation time, sick pay and/or paid time off, nor shall Buyer assume any employment contract of any employee of Sellers. Buyer shall not be liable for any obligation, liability or cost associated with the termination by Sellers of any employee or consultant of Sellers on or prior to the Closing Date.

**6.3    Change in Corporate Name**. At Closing, Spirits and Distillery will change their corporate name to a name that does not contain, and will not likely be confused with, its existing name, or any derivative thereof, and shall thereafter cease using any such names.

**6.4    Payments Received After Closing**. In the event that Sellers receive any payment relating to any Acquired Assets or relating to services performed or goods sold by Buyer after Closing, such payment shall be the property of, and shall be immediately forwarded and remitted to Buyer, and Sellers shall promptly deliver to Buyer any such cash, and shall promptly endorse and deliver to Buyer any such checks or other negotiable instruments, and Buyer is hereby authorized by Sellers to endorse and deposit such payment for its own account.

10

**6.5    Maintenance of and Access to Records**. After the Closing Date, Sellers shall provide Buyer with access (and the opportunity to make copies), from time to time during normal business hours and upon reasonable notice, to any records relating to the Business that are retained by Sellers.

**6.6    Further Assurances**. Sellers shall use their best efforts to implement the provisions of this Agreement, and for such purpose Sellers, at the request of Buyer at or after the Closing and without further consideration, shall promptly execute and deliver, or cause to be executed and delivered, to Buyer such deeds, assignments, bills of sale, Consents and other instruments in addition to those specifically required by this Agreement, in form and substance satisfactory to Buyer, and take all such other actions as Buyer may reasonably deem necessary or desirable to implement any provision of this Agreement or to more effectively transfer, convey and assign to Buyer good and marketable title to, and to put Buyer in actual possession and operating control of, all of the Acquired Assets, free and clear of all Liens.

**6.7    Cooperation in Defense of Claims**. In the event that a claim is asserted against Buyer or any of its officers, directors, members, employees or agents with respect to events or conditions occurring or existing in connection with, or arising out of, the operation of the Business prior to the Closing Date or the ownership, possession, use or sale of the Acquired Assets prior to the Closing Date, Sellers shall cooperate in all reasonable respects in the defense of any such claim.

## ARTICLE VII.  COVENANTS OF BUYER

**7.1    Maintenance of and Access to Records**. After the Closing Date, Buyer shall provide Sellers with access (and the opportunity to make copies), from time to time during normal business hours and upon reasonable notice, to such business records delivered to Buyer pursuant to this Agreement as may be required by Sellers for any legitimate purpose (such as an audit or investigation by a Governmental Authority or a matter relating to insurance coverage or third party claims) relating to the operation of the Business by Sellers prior to the Closing. Buyer shall preserve and maintain the records relating to the Business that are part of the Acquired Assets for at least five (5) years after the Closing Date.

**7.2    Payments Received After Closing**. In the event that Buyer receives any payment relating to any Retained Assets, such payment shall be the property of, and shall be immediately forwarded and remitted to Sellers, and Buyer shall promptly deliver to Sellers any such payment received, and Sellers are hereby authorized to endorse and deposit such payment for its own account.

**7.3    Employment Matters**. Immediately after Closing, Buyer may offer employment to such of Sellers' employees as Buyer may choose, on terms and conditions to be established by Buyer in its discretion. Buyer expects any such employment to commence immediately or shortly after the Closing.

**7.4    Further Assurances**. Buyer shall use its best efforts to implement the provisions of this Agreement, and for such purpose Buyer, at the request of Sellers at or after the Closing and without further consideration, shall promptly execute and deliver, or cause to be executed and

11

delivered, to Sellers such instruments in addition to those specifically required by this Agreement, in form and substance satisfactory to Sellers, and take all such other actions as Sellers may reasonably deem necessary or desirable to implement any provision of this Agreement.

**7.5    Cooperation in Defense of Claims**. In the event that a claim is asserted against Sellers or any of its officers, directors, members, employees or agents with respect to events or conditions occurring or existing in connection with, or arising out of, the operation of the Business subsequent to the Closing Date or the ownership, possession, use or sale of the Acquired Assets subsequent to the Closing Date, Buyer shall cooperate in all reasonable respects in the defense of any such claim; provided, that it is understood and agreed by the parties hereto that Buyer shall have no liability with respect to reimbursing or indemnifying the Sellers with respect to the cost of any such defense. Nothing in this **Section 7.5** shall be construed as limiting in any way whatsoever Sellers' rights under **Article VIII**.

## ARTICLE VIII. BANKRUPTCY

**8.1    Sale Motion**. Within ten (10) business days of the Petition Date, Sellers shall file with the Bankruptcy Court in the Case a motion to approve the transactions contemplated herein (the "**Sale Motion**") asking the Bankruptcy Court to enter an order (the "**Sale Order**"): (1) approving the terms of this Agreement and Sellers' actions to be taken under the same; (2) specifically authorizing the sale of the Acquired Assets to Buyer free and clear of liens, claims, and encumbrances; (3) including no further conditions or contingencies, except as set forth herein; (4) assuming the Assumed Contracts and assigning them to Buyer; (5) waiving the stay of the order pursuant to Fed. R. Bankr. P. 6004(h) such that the order becomes a final order upon entry; and (6) asking the Bankruptcy Court to approve sale procedures and limiting notice on such motion approving the Sale Procedures to seven (7) business days' notice. The parties understand that through the Sale Motion process, this Agreement entire will be made public. The entry of the Sale Order is a condition precedent to Buyer's obligation to close the transactions contemplated by this Agreement.

**8.2    Sale Procedures**. The Sale Motion will request the entry of the following Sale Procedures:

A.     The Sale Motion will request approval of (i) a breakup fee of $50,000 payable to Buyer if it is not the ultimate purchaser of the Acquired Assets and (ii) an expense reimbursement of for expenses incurred by the Buyer in connection due diligence conducted on the Business and with respect to the preparation of negotiating and executing this Agreement in an amount equal to (i) $40,000 if the Auction occurs on or prior to December 24, 2018 and (ii) $60,000 if the bid occurs after December 24, 2018.

B.     Due Diligence. Other parties may be interested in making competing offers. Sellers will provide to any interested party access to an online data room containing the due diligence materials within two (2) business days of any interested party requesting the same.

C.     Offer Package. Parties interested in making an offer to purchase the Acquired Assets (each a "Potential Purchaser"), no later than the Offer Deadline set forth in the Sale Motion, must

12

submit to the Sellers a package (the "Offer Package") that includes all of the following items (the Buyer shall be deemed a "Potential Purchaser" and the Agreement shall be deemed a "Qualified Offer"):

1. A signed offer to purchase the Acquired Assets ("Offer"), meeting the requirements set forth below.

2. A written acknowledgement that it agrees to all the terms set forth in these Sale Procedures and agrees that the Offer constitutes an irrevocable offer and is binding on the Potential Purchaser until the Sale Approval Hearing;

3. Written evidence it has obtained authorization and approval from its Board of Directors (or comparable governing body), if necessary, with respect to the submission of its Offer and acceptance of the terms of sale set forth in these Sale Procedures, or representations that no such authorization or approval is required;

4. Financial statements and/or written evidence of a financing commitment or other evidence, satisfactory to Sellers and any creditors' committee of the financial ability to close pursuant to its Offer by the date set forth in the Offer (provided, however, that the closing of the sale shall not be contingent in any way on the Potential Purchaser procuring financing);

5. Earnest Money of $50,000, in the form of a wire transfer to DeMarb Brophy LLC escrow account, which will be returnable to the Potential Purchaser, as set forth below.

6. The identity of the individual authorized to bid at Auction and contact information for such individual.

D. <u>Competing Offers:</u>

1. Shall not contain a break-up fee or any other expense reimbursement;

2. Shall contain a minimum purchase price of $900,000 plus the Inventory Amount for the Acquired Assets;

3. Shall contain a disclosure of the identity of each entity or person submitting the Offer or otherwise participating in the Offer, and the complete terms of any such participation;

4. Shall be created by using the Agreement, and redlining the Agreement to create the Offer; and

5. Shall not provide for a commission to be paid from the purchase price.

E. Sellers, together with a creditors' committee, if any, will analyze each Offer based on the criteria detailed above to determine which Offers will be treated as "Qualified Offers"

13

based on the capability of the Potential Purchaser to ultimately close on the purchase of the real estate and the amount of the Offer. Sellers may, at any time, contact Potential Purchasers to discuss or clarify terms, to indicate any terms which may need to be modified to conform an Offer to a Qualified Offer, or to negotiate terms.

F.    This Agreement is a Qualified Offer.  If no additional Qualified Offers are made, Sellers will request that the Court approve the Agreement.

G.    If one or more than one Qualified Offers are submitted in addition to the Agreement, within five (5) days of the Offer Deadline, the Sellers will submit to each Potential Purchaser with Qualified Offers the following information:

  1.    The amount of the Offer the Sellers has deemed to be the highest Qualified Offer (the "Highest Qualified Offer"), as determined by the Sellers in her best business judgment and after consultation with any creditors' committee; and

  2.    Until the day of the Auction, described below, the Adjusted Purchase Price of each Qualified Offer will only be shared with the party making such Qualified Offer

H.    Sellers, in the exercise of their reasonable business judgment, reserve the right to reject any Offer if such Offer:

  1.    Is not received by the Offer Deadline;

  2.    Is subject to any due diligence, financing contingency or other contingency (including representations, warranties, covenants and timing requirements) or an estimated time to close which is materially different from those in the Agreement and which the Sellers does not believe may be adjusted pursuant to the Auction section of these Sale Procedures, below; or

  3.    Provides less economic benefit to the Sellers' estates.

Any Offer rejected pursuant to this Paragraph shall not be deemed to be a Qualified Offer.

I.    The Auction will be held at a date and time set by the Court.  The Auction may be postponed by announcement by Sellers, but not for more than three (3) business days. The Auction may be conducted by telephone, at the discretion of Sellers.

  1.    Sellers may establish and announce rules on the conduct of the Auction and may modify those rules in its discretion; provided that such rules are in all material respects consistent with these Sale Procedures and are designed to promote the most competitive bidding process.

  2.    All Potential Purchasers with Qualified Offers shall be eligible to participate in the Auction.

14

3.     Bidding shall begin with Sellers' *announcement of the Potential Purchasers and of the Highest Qualified Offer.* Sellers shall request additional bids with an initial minimum overbid of at least $50,000 over the Highest Qualified Offer (the "Initial Over Bid"). At the same time, the Sellers will announce the adjusted amount of all other Qualified Offers.

4.     After the Initial Over Bid, all additional bids must be in increments of not less than $25,000.

5.     Sellers will establish reasonable time periods between bids to allow Potential Purchasers an opportunity to bid. Bidding will be deemed to be closed when Sellers requests additional bids three times without a response and announces the bidding closed. The final bid shall be the "**Prevailing Bid**" and the Qualified Bidder making such bid will be the "**Prevailing Bidder**."

J.     No additional Bids will be considered after the end of the Auction.

K.     EACH BID SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE PREVAILING BIDDER UNTIL COURT APPROVAL OF THE SALE PURSUANT TO THE PREVAILING BID.

## ARTICLE IX.  [INTENTIONALLY LEFT BLANK]

## ARTICLE X.  MISCELLANEOUS

**10.1     Amendments/Waivers**. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**10.2     Entire Agreement**. This Agreement and the other Transaction Documents set forth the entire understanding of the parties hereto with respect to the subject matter hereof and supersede all prior contracts, agreements, arrangements, communications, discussions, representations and warranties, whether oral or written, among the parties.

**10.3     Governing Law; Submission to Jurisdiction; Waiver of Jury**.

Trial.

(a)     Once a Case is filed, the Court in which the Case is venued will have authority to resolve all disputes with regard to this Agreement.

15

(b)      This Agreement shall in all respects be governed by and construed in accordance with the internal laws of the State of Wisconsin, without regard to its conflicts of law principles.

(c)      Until a Case is filed, a legal suit, action or proceeding arising out of or based upon this agreement, the other transaction documents or the transactions contemplated hereby or thereby may be instituted in the federal courts of the United States or the courts of the State of Wisconsin in each case located in the City of Madison and County of Dane, and each party irrevocably submits to the nonexclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Notwithstanding the foregoing, no party shall be prohibited from instituting any legal suit, action or proceeding arising out of or based upon this agreement, the other transaction documents or the transactions contemplated hereby or thereby, in any other court of competent jurisdiction.

(d)      Each party acknowledges and agrees that any controversy which may arise under this agreement or the other transaction documents is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this agreement, the other transaction documents or the transactions contemplated hereby or thereby. Each party to this agreement certifies and acknowledges that (a) no representative of any other party has represented, expressly or otherwise, that such other party would not seek to enforce the foregoing waiver in the event of a legal action, (b) such party has considered the implications of this waiver, (c) such party makes this waiver voluntarily, and (d) such party has been induced to enter into this agreement by, among other things, the mutual waivers and certifications in this **section 10.3(c)**.

(e)      In the event of any dispute or controversy between the Buyer, on the one hand, and Sellers and/or any other Sellers Party, on the other hand, arising out of this Agreement or the transactions contemplated hereby, the prevailing party shall be entitled to recover from the other party reasonable attorneys' fees and expenses incurred by the prevailing party, as awarded by the court.

**10.4    Notices**. Any notice, request or other communication required or permitted hereunder shall be in writing and shall be deemed to have been duly given (a) when received, if personally delivered or sent by telecopy, (b) within three business days after being deposited with the United States Postal Service, if sent by registered or certified mail, return receipt requested and postage prepaid, or (c) within one (1) business day after being deposited with an established overnight courier for priority delivery, in each case to the parties at their respective addresses set forth below.

| | |
|---|---|
| **To Sellers:** | Death's Door Spirits, LLC<br>Death's Door Distillery, LLC<br>2220 Eagle Drive<br>Middleton, WI 53562<br>Attention:  Brian Ellison |
| with a copy to: | DeMarb Brophy LLC<br>1 N. Pinckney Street, Suite 300<br>Madison, Wisconsin 53703<br>Attention: Rebecca R. DeMarb |
| **To Buyer:** | CDF Capital LLC<br>528 W Wrightwood<br>Chicago, IL 60614<br>Attention:  Ted Diamantis |
| with a copy to: | Winston & Strawn<br>35 W. Wacker Drive<br>Chicago, IL 60601<br>Attention:  John Glassgow |

Any party by written notice to the others given in accordance with this **Section 10.4** may change the address or the persons to whom notices or copies thereof shall be directed.

      **10.5**    **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together will constitute one and the same instrument.

      **10.6**    **Assignment**. This Agreement shall be binding upon and inure to the benefit of the successors and permitted assigns of each of the parties hereto, but no rights, obligations or Liabilities hereunder shall be assignable by any party without the prior written consent of the other parties.

      **10.7**    **Waivers**. Any party hereto may waive in writing compliance by any of the other parties hereto (to the extent such compliance is for the benefit of the party giving such waiver) with any of the terms, covenants or conditions contained in this Agreement or in any of the other Transaction Documents (except such as may be imposed by Law). Any waiver by any party of any violation of, breach of or default under any provision of this Agreement or any of the other Transaction Documents by any other party shall not be construed as, or constitute, a continuing waiver of such provision or waiver of any other violation of, breach of or default under any other provision of this Agreement or any of the other Transaction Documents.

      **10.8**    **Expenses; Transfer Taxes**. All state, county and local ad valorem Taxes on the personal property included in the Acquired Assets for the year ended December 31, 2018 shall be assumed and paid by Buyer. All other sales, transfer, recordation and documentary Taxes and fees that may be payable in connection with the transactions contemplated by this Agreement shall be

17

borne by the party responsible for such Taxes and fees under applicable law and customary practice.

**10.9    Schedules and Exhibits**. References in this Agreement to "**Schedules**" or "**Exhibits**" are to the Schedules and Exhibits attached to this Agreement. The Schedules and Exhibits attached to this Agreement are incorporated herein and shall be part of this Agreement for all purposes.

**10.10    Headings**. The headings in this Agreement are solely for convenience of reference and shall not be given any effect in the construction or interpretation of this Agreement.

**10.11    Interpretation**. For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**10.12    Remedies Not Exclusive**. No remedy conferred by any of the specific provisions of this Agreement is intended to be exclusive of any other remedy, and each remedy shall be cumulative and shall be in addition to every other remedy given hereunder or hereafter existing at law or in equity or by statute or otherwise. Except as otherwise expressly provided herein, no remedy shall be deemed to be a limitation on the amount or measure of damages resulting from any breach of this Agreement. The election of any one or more remedies shall not constitute a waiver of the right to pursue other available remedies.

**10.13    Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**10.14    Tax Cooperation.** Sellers and Buyer shall provide each other with such cooperation and information as either party may reasonably request of the other in filing any Tax Return or in connection with any audit or other proceeding in respect of any Taxes of the Sellers.

18

Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents. Sellers and Buyer shall retain all Tax Returns, schedules, work papers, records and other documents in its possession relating to Tax matters of the Company for any taxable period beginning before the Closing Date until the expiration of the statute of limitations of the taxable periods to which such Tax Returns and other documents relate.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Sellers have executed this Agreement as of the date first written above.

**SELLERS**

Death's Door Spirits, LLC

By: _____

**SELLERS**

Death's Door Distillery, LLC

By: _____

IN WITNESS WHEREOF, the Buyer executed this Agreement as of the date first written above.

**BUYER**

**CDF CAPITAL LLC**

By: _____
       Name: Ted Diamantis
       Title: Manager

| | Schedule 1(a) | | | |
|---|---|---|---|---|
| | Inventory | | | |
| Inventory | Quantity on Hand as of 11/19/18 | Cost | | Location |
| **PAK (PACKAGING MATERIALS)** | | | | |
| 100 (-----Bottles-----) | | | | |
| 00 (Bottle-Anchor 750ml) | 8094 | $ | 1.23 | $ 9,956 | Middleton or Supplier |
| 05 (Bottle-Anchor 700ml) | 12870 | $ | 1.46 | $ 18,790 | Middleton or Supplier |
| 10 (Bottle-Anchor 1L) | 8178 | $ | 1.65 | $ 13,494 | Middleton or Supplier |
| 15 (Bottle-1.75L Handle) | 840 | $ | 1.58 | $ 1,327 | Middleton or Supplier |
| 20 (Bottle-Vodka 750ml) | 0 | $ | 1.89 | $   - | |
| 25 (Bottle-Vodka 1L) | 0 | $ | 2.42 | $   - | |
| 30 (Bottle-Vodka 700ml) | 0 | $ | 2.72 | $   - | |
| 35 (Bottle-White Whisky 750ml) | 0 | $ | 1.30 | $   - | |
| 40 (Bottle-Distinction 750ml) | 0 | $ | 1.00 | $   - | |
| 45 (Bottle-New Make 700ml) | 1434 | $ | 1.89 | $ 2,710 | Middleton or Supplier |
| 50 (Bottle-Kringle Cream 750ml) | 0 | $ | 0.99 | $   - | |
| 55 (Bottle-Wondermint 750ml) | 23564 | $ | 2.97 | $ 69,985 | Middleton or Supplier |
| 60 (Bottle-Gin 50ml) | 16128 | $ | 0.41 | $ 6,612 | Middleton or Supplier |
| 65 (Bottle-Vodka 50ml) | 0 | $ | 0.45 | $   - | Middleton or Supplier |
| 70 (Bottle-Magnus 750ml ) | 0 | $ | 0.65 | $   - | Middleton or Supplier |
| 75 (Bottle-Sample Bottle 200ml) | 528 | $ | 0.65 | $ 343 | Middleton or Supplier |
| | Total 100 (-----Bottles-- | | | $ 123,218 | |
| 200 (-----Closures-----) | | | | |
| 00 (Closure-Stelvin Cap Gin) | 139400 | $ | 0.13 | $ 18,122 | Middleton or Supplier |
| 05 (Closure-Stelvin Cap Vodka) | 103700 | $ | 0.15 | $ 15,555 | Middleton or Supplier |
| 10 (Closure-Stelvin Cap Kringle Cream) | 0 | $ | 0.16 | $   - | |

| Item | Qty | | Price | | Amount | Supplier |
|---|---|---|---|---|---|---|
| 15 (Closure-Stelvin Cap Wondermint) | 68500 | $ | 0.17 | $ | 11,645 | Middleton or Supplier |
| 16 (Closure-Stelvin Cap DD Black) | 149200 | $ | 0.14 | $ | 20,888 | Middleton or Supplier |
| 20 (Closure-Stelvin Cap Magnus (Gold)) | 0 | $ | 0.16 | $ | - | |
| 25 (Closure-Tapi Cork Wood) | 150 | $ | 0.27 | $ | 41 | Middleton or Supplier |
| 30 (Closure-Tapi Cork Synthetic) | 0 | $ | 0.15 | $ | - | |
| 35 (Closure-Plastic Cap 50ml) | 89800 | $ | 0.11 | $ | 9,878 | Middleton or Supplier |
| 40 (Closure-White Cap 1.75L) | 3600 | $ | 0.09 | $ | 324 | Middleton or Supplier |
| 45 (Closure-Black Cap Gin 1.75L (OBS)) | 750 | $ | 0.25 | $ | 188 | Middleton or Supplier |
| 50 (Closure-White Whisky Capsule 750ml) | 0 | $ | 0.06 | $ | - | |
| 55 (Closure-Black Cap for 200ml Bottles) | 528 | $ | - | $ | - | Middleton |
| Total 200 (----Closures | | | | $ | 76,640 | |
| | | | | | | |
| 300 (----Shipping Cartons----) | | | | | | |
| 00 (Carton-Gin/Vodka 750ml) | 0 | $ | 0.55 | $ | - | |
| 05 (Carton-Anchor 6 700ml/750ml) | 3494 | $ | - | $ | - | |
| 06 (Carton-Anchor 6 1L) | 1363 | $ | - | $ | - | |
| 15 (Carton-Gin/Vodka 1L) | 0 | $ | 0.82 | $ | - | |
| 16 (Carton-Gin/Vodka1.75L) | 0 | $ | - | $ | - | |
| 20 (Carton-Gin/Vodka 700ml) | 0 | $ | 0.44 | $ | - | |
| 25 (Carton-White Whisky 750ml) | 0 | $ | 0.36 | $ | - | |
| 26 (Carton-Whisky 700ml/750ml) | 275 | $ | 0.90 | $ | 248 | Middleton or Supplier |
| 30 (Carton-Wondermint 750ml) | 2099 | $ | 0.70 | $ | 1,469 | Middleton or Supplier |
| 31 (Carton-Kringle Cream 750ml) | 0 | $ | - | $ | - | |
| 35 (Carton-Gin/Vodka 12-pack Display 50m) | 5865 | $ | 0.39 | $ | 2,287 | Middleton or Supplier |
| 40 (Carton-Gin//Vodka Master 50ml) | 1168 | $ | 0.91 | $ | 1,063 | Middleton or Supplier |
| 45 (Carton-Gin & Flask VAP Display Box) | 0 | $ | - | $ | - | |
| 50 (Carton-Gin & Flask VAP Shipper) | 0 | $ | - | $ | - | |
| 55 (Carton-Vodka BarTool VAP Display Box) | 0 | $ | - | $ | - | |
| 60 (Carton-Vodka Bar Tool VAP Shipper) | 0 | $ | - | $ | - | |
| 300 (----Shipping Cartons----) - Other | 756 | $ | 0.67 | $ | 507 | Middleton or Supplier |
| Total 300 (----Shipping | | | | $ | 5,574 | |
| | | | | | | |
| 400 (----Carton Dividers----) | | | | | | |
| 00 (Divider-Anchor 6 700ml/750ml) | 3494 | $ | - | $ | - | |
| 01 (Divider-Anchor 6 1L) | 1363 | $ | - | $ | - | |
| 02 (Divider-Gin/Vodka 750ml) | 0 | $ | - | $ | - | |

| Item | Qty | Unit $ | Amount $ | Supplier |
|---|---|---|---|---|
| 03 (Divider-Gin/Vodka 1.75L) | 0 | $ - | $ - | |
| 05 (Divider-Wondermint 750ml) | 3515 | $ 0.28 | $ 984 | Middleton or Supplier |
| 06 (Divider-Kringle Cream 750ml) | 0 | $ - | $ - | |
| 10 (Divider-White Whisky 750ml) | 0 | $ 0.25 | $ - | |
| 11 (Divider-Whisky 700ml/750ml) | 275 | $ 1.75 | $ 481 | Middleton or Supplier |
| 15 (Divider-Gin/Vodka 700ml) | 0 | $ 0.32 | $ - | |
| 500 (-----Labels-----) | Total 400 (----Carton D | | $ 1,465 | |
| 00 (Label-(FRONT) Gin 750ml) | 7000 | $ 0.10 | $ 700 | Middleton or Supplier |
| 05 (Label-(BACK) Gin 750ml) | 0 | $ 0.05 | $ - | |
| 10 (Label-(FRONT) Gin 1L) | 0 | $ 0.13 | $ - | |
| 15 (Label-(BACK) Gin 1L) | 0 | $ 0.06 | $ - | |
| 20 (Label-Gin 1.75L Handle) | 1000 | $ 0.15 | $ 150 | Middleton or Supplier |
| 21 (Label-Vodka 1.75L Handle) | 1700 | $ 0.15 | $ 255 | Middleton or Supplier |
| 25 (Label-(FRONT) Gin 700ml) | 0 | $ 0.14 | $ - | |
| 30 (Label-(BACK) Gin 700ml) | 19600 | $ 0.07 | $ 1,372 | Middleton or Supplier |
| 31 (Label-(BACK) Australia Gin 700ml) | 2300 | $ 0.13 | $ 299 | Middleton or Supplier |
| 32 (Label-(Front) Single Grain Vodka 1L) | 3200 | $ 0.23 | $ 736 | Middleton or Supplier |
| 33 (Label-(Back) Single grain Vodka 1L) | 3200 | $ 0.22 | $ 704 | |
| 35 (Label-(FRONT) Vodka 1L) | 14000 | $ 0.13 | $ 1,820 | Middleton or Supplier |
| 40 (Label-(BACK) Vodka 1L) | 14500 | $ 0.10 | $ 1,450 | Middleton or Supplier |
| 41 (Label-(FRONT) White Whisky 750ml) | 850 | $ 0.51 | $ 434 | Middleton or Supplier |
| 42 (Label-(BACK) White Whisky 750ml) | 850 | $ 0.18 | $ 153 | Middleton or Supplier |
| 45 (Label-(FRONT) Wondermint 700ml UK) | 4200 | $ 0.14 | $ 588 | Middleton or Supplier |
| 50 (Label-(BACK) Wondermint 700ml UK) | 600 | $ 0.15 | $ 90 | Middleton or Supplier |
| 51 (Label-Jerry Thomas 700ml) | 200 | $ 0.80 | $ 160 | Middleton or Supplier |
| 55 (Label-Canada Whiskey 750ml) | 0 | $ 0.14 | $ - | |
| 60 (Label-Canada Gin 750ml) | 0 | $ 0.27 | $ - | |
| 65 (Label-50ml Display 2.25" x 1.25") | 7 | $ 35.67 | $ 250 | Middleton or Supplier |
| 70 (Label-Neck Tag Gin 750ml) | 0 | $ - | $ - | |
| 71 (Label - Single Barrel Bourbon Identifier) | 0 | $ 0.22 | $ - | |
| 75 (Label-Case 4" x 3") | 43750 | $ 0.02 | $ 875 | Middleton or Supplier |
| 80 (Label-Case 5"X4" 1.75L) | 352 | $ 0.28 | $ 99 | Middleton or Supplier |
| 85 (Label-Pallet 4"X6") | 4500 | $ 0.01 | $ 45 | Middleton or Supplier |

| Item | Qty | Unit $ | Total $ | Supplier |
|---|---|---|---|---|
| 86 (Label-Pallet 4" X 6.5 ") | 2700 | $ 0.04 | $ 108 | Middleton or Supplier |
| 90 (Label-(BACK) Canada Gin 6/750ml) | 1750 | $ 0.16 | $ 280 | Middleton or Supplier |
| 501 (-----Labels-----) | Total 500 (----Labels--- | | $ 10,567 | |
| 00 (Label (Front) Gin 750ml) | 38400 | $ 0.08 | $ 3,072 | Middleton or Supplier |
| 01 (Label (Back) Gin 750ml) | 43200 | $ 0.06 | $ 2,592 | Middleton or Supplier |
| 03 (Label 700 ml FRONT) | 21600 | $ 0.12 | $ 2,592 | Middleton or Supplier |
| 06 (Label (Front) GIN 1 L) | 16800 | $ 0.11 | $ 1,848 | Middleton or Supplier |
| 07 (Label (Back) Gin 1 L) | 16900 | $ 0.07 | $ 1,183 | Middleton or Supplier |
| 09 (Label-(BACK) Gin 700ml UK) | 13000 | $ 0.07 | $ 910 | Middleton or Supplier |
| 43 (Label (FRONT)- Vodka 750mL) | 600 | $ 0.21 | $ 126 | Middleton or Supplier |
| 44 (Label (Back)- Vodka 750mL) | 600 | $ 0.13 | $ 78 | Middleton or Supplier |
| 72 (Label(Front)-Black Earth Bourbon 750m) | 6000 | $ 0.18 | $ 1,080 | Middleton or Supplier |
| 73 (Label(BACK)-Black Earth Bourbon 750m) | 6000 | $ 0.05 | $ 300 | Middleton or Supplier |
| 600 (-----General-----) | Total 501 (----Labels--- | | $ 13,781 | |
| 00 (Tape-Gin Carton Tape) | 0 | $ 48.21 | $ - | |
| 01 (Tape: Gin Custom Carton Tape) | 88 | $ 25.89 | $ 2,278 | Middleton or Supplier |
| 05 (Tape-Vodka Carton Tape) | 14 | $ 48.21 | $ 675 | Middleton or Supplier |
| 06 (Vodka Custom Carton Tape) | 30 | $ 25.89 | $ 777 | Middleton or Supplier |
| 10 (Tape-Carton Tape) | 2 | $ 3.70 | $ 7 | Middleton or Supplier |
| 15 (Premium-Gin VAP Flask) | 0 | $ - | $ - | |
| 25 (Premium-Vodka VAP Bar Tools) | 0 | $ - | $ - | |
| 30 (Clear Plastic Machine Length Wrap) | 20 | $ 48.50 | $ 970 | Middleton or Supplier |
| 32 (Yellow Plastic Hand Wrap) | 3 | $ 18.90 | $ 57 | Middleton or Supplier |
| 34 (Green Plastic Hand Wrap) | 6.5 | $ 23.00 | $ 150 | Middleton or Supplier |
| 36 (Blue Plastic Hand Wrap) | 6.5 | $ 18.90 | $ 123 | Middleton or Supplier |
| 38 (Orange Plastic Hand Wrap) | 2 | $ 18.90 | $ 38 | Middleton or Supplier |
| 40 (Black Plastic Hand Wrap) | 2 | $ 18.00 | $ 36 | Middleton or Supplier |
| 42 (Purple Plastic Hand Wrap) | 3 | $ 23.00 | $ 69 | Middleton or Supplier |
| 50 (Pallet-GMA #1 40 x 48) | 8 | $ 12.14 | $ 97 | Middleton or Supplier |
| 55 (Barrel-Kelvin 53gal #4 Char) | 0 | $ 225.35 | $ - | |
| 56 (Barrel-Kelvin 53gal #3 Char) | 0 | $ 220.00 | $ - | Middleton or Supplier |
| 60 (Barrel-Atlas 53gal Toast/#4 Char) | 0 | $ 205.00 | $ - | |

| Item | Qty | Unit | Total | Supplier |
|---|---|---|---|---|
| 80 (White Straining Bag 18 x 32) | 4 | $ 3.79 | $ 15 | Middleton or Supplier |
| 81 (Barrel-Kelvin 15gal Medium toast) | 13 | $ 245.00 | $ 3,185 | |
| 82 (Barrel-Kelvin 15gal #3 Char) | 236 | $ 245.00 | $ 57,820 | Middleton or Supplier |
| 90 (Racks- WS 4 Barrel) | 60 | $ 209.00 | $ 12,540 | Middleton or Supplier |
| | Total 600 (-----General- | | $ 78,836 | Middleton or Supplier |
| | | | $ 310,081 | |
| **RAW (RAW MATERIALS)** | | | | |
| 100 (------Grains & Botanicals-----) | | | | |
| 00 (Grain-Raw Rye -3000 lb super sac) | 0 | $ 0.26 | $ - | |
| 01 (Grain-Raw Rye - 50lbs bags) | 0 | $ 0.26 | $ - | |
| 05 (Grain-Yellow Corn - 3000 lb super sac) | 0 | $ 0.19 | $ - | |
| 15 (Grain-Red Winter Wheat) | 0 | $ 0.20 | $ - | |
| 16 (Grain-Hard Red Winter Wheat) | 12000 | $ 0.25 | $ 3,000 | Middleton |
| 17 (Grain - Hard Red Winter Wheat - for CO | 2700 | $ - | $ - | |
| 20 (Grain-Distiller's Malt/Barley) | 0 | $ 0.61 | $ - | |
| 21 (Grain-Distiller's Malt/Barley - 50 lbs bag | 0 | $ 0.60 | $ - | |
| 22 (Malted Barley 3000 lb super sack) | 8000 | $ 0.61 | $ 4,880 | Middleton |
| 23 (Malted Barley (Briess)1800 lb super sac | 0 | $ 0.58 | $ - | Middleton |
| 25 (Botanical-Juniper Berries) | 25 | $ 3.40 | $ 85 | Middleton |
| 30 (Botanical-Coriander) | 8 | $ 2.55 | $ 20 | Middleton |
| 35 (Botanical-Fennel) | 20 | $ 2.81 | $ 56 | Middleton |
| | | | $ 8,041.60 | |
| 200 (-----Adjuncts-----) | | | | |
| 00 (Yeast-FermPro 048) | 32 | $ 10.50 | $ 336 | Middleton |
| 05 (Yeast-FermPro 921) | 35 | $ 11.02 | $ 386 | Middleton |
| 10 (Yeast-Red Star Cuvee') | 18 | $ 11.77 | $ 212 | Middleton |
| 15 (Enzyme-Diazyme SSF) | 14 | $ 8.23 | $ 115 | Middleton |
| 17 (Enzyme-Diazyme SSF) | 0 | $ - | $ - | |
| 20 (Enzyme-Diazyme X4) | 14 | $ 6.19 | $ 87 | Middleton |
| 25 (Enzyme-Amylex PA) | 33 | $ 10.83 | $ 357 | Middleton |
| 30 (Enzyme-Laminex C2K) | 12 | $ 14.88 | $ 179 | Middleton |
| 35 (Chemical-Citric Acid) | 1200 | $ 1.05 | $ 1,260 | Middleton |
| 36 (Chemical-Simple Green Original) | 1 | $ 1.17 | $ 1 | Middleton |
| 40 (Chemical-AntiFoam) | 1.5 | $ 5.00 | $ 8 | Middleton |
| 45 (Chemical-Caustic Soda Beads) | 0 | $ 0.70 | $ - | Middleton |

| | | | | |
|---|---|---|---|---|
| 50 (Chemical-Beta Stab Hop Extract) | 0 | $ 70.00 | $ - | |
| 55 (Chemical-Diamonium Phosphate) | 22.7 | $ 1.10 | $ 25 | Middleton |
| 60 (Chemical-Water Salts) | 4680 | $ 1.10 | $ 5,148 | Middleton |
| 65 (Chemical-Avoid II) | 0 | $ 10.37 | $ - | |
| 75 (Chemical-WaterTech 3730) | 100 | $ 10.41 | $ 1,041 | Middleton |
| 80 (Chemical-WaterTech 3774) | 455 | $ 24.04 | $ 10,938 | Middleton |
| 81 (Chemical-Enrich) | 3 | $ 11.12 | $ 33 | Middleton |
| 82 (Chemical-Hydribrew Alkaline CIP) | 602 | $ 5.21 | $ 3,136 | Middleton |
| 83 (Chemical-Hydrate Beer Stone Remover) | 45 | $ 16.83 | $ 757 | Middleton |
| | | | $ 24,019.36 | |
| 300 (-----General-----) | | | | |
| 00 (Ingredient-Ultra Pure 6X Corn NGS) | 1710 | $ 3.42 | $ 5,848 | Middleton |
| 05 (Ingredient-Kringle Cream Liqueur) | 0 | $ 11.23 | $ - | |
| 10 (Ingredient-Peppermint Flavoring) | 12 | $ 69.10 | $ 829 | Middleton |
| 15 (Ingredient-Almond Bitter Oil) | 3 | $ 9.00 | $ 27 | Middleton |
| 20 (Ingredients-Liquid Sucrose) | 0 | $ 1.18 | $ - | |
| 25 (Ingredient-Barreled Whiskey 60% corn/ | 0 | $ - | $ - | |
| | | | $ 6,704.40 | |
| | | | **$ 38,765.36** | |
| | | | | |
| **FIN (FINISHED GOODS)** | | | | |
| 100 (-----Gin-----) | | | | |
| 00 (Gin-Death's Door 6/750ml) | 3017 | $ 54.66 | $ 164,905 | Middleton |
| 05 (Gin-Death's Door 6/1L) | 686 | $ 71.86 | $ 49,298 | Middleton |
| 10 (Gin-Death's Door 6/1.75L) | 198 | $ 108.36 | $ 21,456 | Middleton |
| 15 (Gin-Death's Door 120/50ml) | 8 | $ 138.18 | $ 1,105 | Middleton |
| 20 (Gin-Gin & Flask VAP 6/750ml) | 0 | $ 45.63 | $ - | |
| 25 (Gin-Death's Door 6/700ml) | 429.2 | $ 46.20 | $ 19,828 | Europe |
| 26 (Gin-Death's Door 6/700ml - Australia) | 0 | | $ - | |
| 30 (Gin-Gin & Flask VAP 6/700ml) | 0 | | $ - | |
| 35 (Gin-Death's Door 6/700ml UK) | 1101 | 46.2 | $ 50,866 | Europe |
| | | | $ 307,458.48 | |
| | | | | |
| 200 (-----Vodka-----) | | | | |
| 00 (Vodka-Death's Door 6/750ml) | 306 | $ 53.47 | $ 16,363 | Middleton |

| Item | Qty | Price | Value | Location |
|---|---|---|---|---|
| 05 (Vodka-Death's Door 6/1L) | 157 | $ 66.26 | $ 10,403 | Middleton |
| 10 (Vodka-Death's Door 3/1.75L) | 0 | | $ - | |
| 11 (Vodka-Death's Door 6/1.75L) | 25 | $ 91.55 | $ 2,289 | Middleton |
| 15 (Vodka-Death's Door 120/50ml) | 35 | $ 136.40 | $ 4,774 | Middleton |
| 20 (Vodka-Vodka Bar Tool VAP 6/750ml) | 0 | | $ - | |
| 25 (Vodka-Death's Door 6/700ml) | 566.5 | $ 55.24 | $ 31,293 | Europe |
| 30 (Vodka - Death's Door Single Grain 6/1L) | 79 | $ 49.96 | $ 3,947 | Middleton |
| | | | $ 69,068.35 | |
| 300 (------Other------) | | | | |
| 00 (White Whisky-Death's Door 6/750ml) | 188 | $ 54.87 | $ 10,316 | Middleton |
| 05 (New Make-Death's Door 6/700ml) | 325.67 | $ 56.06 | $ 18,257 | Europe |
| 10 (Kringle Cream 6/750ml) | 0 | $ 56.91 | $ - | |
| 11 (Kringle Cream 12/750ml) | 0 | | $ - | |
| 15 (Wondermint 6/750ml) | 254 | $ 58.42 | $ 14,839 | Middleton |
| 20 (Wondermint 6/700ml) | 274.2 | $ 42.69 | $ 11,705 | Europe |
| 30 (Death's Door Black Earth Bourbon) | 774 | $ 71.10 | $ 55,035 | |
| 300 (------Other------) - Other | 0 | | $ - | |
| | | | $ 110,153 | |
| | | | $ 486,679.60 | |
| **WIP (WORK IN PROCESS)** | | | | |
| 100 (------Base Distillates------) | | | | |
| 00 (Base Distillate-DDS Base) | 360 | $ 5.44 | $ 1,958 | Middleton |
| 05 (Base Distillate-Gin) | 694 | $ 5.22 | $ 3,623 | Middleton |
| 10 (Base Distillate-High Juniper) | 0 | $ 5.00 | $ - | Middleton |
| 15 (Base Distillate-Vodka) | 489 | $ 4.15 | $ 2,029 | Middleton |
| 20 (Base Distillate-Wondermint) | 0 | $ 4.61 | $ - | |
| 25 (Base Distillate-White Whisky/New Make | 236 | $ 4.59 | $ 1,083 | Middleton |
| | | | $ 8,694 | |
| 200 (------Bulk Spirits------) | | | | |
| 00 (Bulk Spirits-Maryland Rye) | 7,850 | $ 3.42 | $ 26,847 | |
| 05 (Bulk Spirits-100%Rye) | 1,838 | $ 5.00 | $ 9,188 | Middleton |
| 07 (Bulk Spirits-95%Rye5%Malt) | 644 | | $ - | |
| 10 (Bulk Spirits-100%Wheat) | - | | $ - | |
| 15 (Bulk Spirits-100%Corn) | - | $ 2.50 | $ - | |

| Item | Qty | | Price | | | Amount | Location |
|---|---|---|---|---|---|---|---|
| 20 (Bulk Spirits-100%Malt) | 1,944 | $ | 8.00 | | $ | 15,552 | Middleton |
| 30 (Bulk Spirits-65% corn, 35% rye) | - | $ | 8.00 | | $ | - | Middleton |
| 35 (Bulk Spirits-60% corn, 40% rye) | - | $ | 8.00 | | $ | - | Middleton |
| 40 (Bulk Spirits - 70% Corn, 25% Rye, 5% Ma | 309 | $ | 30.50 | | $ | 9,425 | Middleton |
| 100 (Bulk Spirits- Miscellaneous) | 3,287 | $ | 2.50 | | $ | 8,218 | Middleton |
| | | | | | $ | 69,229 | |
| 500 (-------Miscellaneous--------) | | | | | | | |
| 00 (Assembled Botanical Bags - DO NOT SEL | 14 | $ | 95.18 | | $ | 1,333 | Middleton |
| | | | | | $ | 1,333 | |
| 800 (----- Labelled Packaging------) | | | | | | | |
| 01 (1.75L Labelled bottles of Gin) | 26 | $ | 1.73 | | $ | 45 | Middleton |
| 02 (1.75 L Labelled bottles of Vodka) | 402 | $ | 1.73 | | $ | 695 | Middleton |
| | | | | | $ | 740 | |
| | | | | | $ | 79,995 | |
| Total Extended Cost of All Inventory, Packaging, Bottles and Labeling (Inventory "Target" for purchase price adjustment) | | | | | $ | 915,521 | |
| Total Purchase Price for Inventory of 11/19/18 | | | | | | $500,000 | |

**Schedule 1.1(g)**

**Equipment**

**Schedule 1.2(a)**

**Personal Items**

**Schedule 1.2(d)**


**Bank Accounts**

## SALE PROCEDURES

### I.    Offer Process

A.    <u>Due Diligence</u>.  Other parties may be interested in making competing offers. Seller will provide to any interested party access to an online data room containing the due diligence materials within two (2) business days of any interested party requesting the same.

B.    <u>Offer Package</u>.  Parties interested in making an offer to purchase the Assets (each a "Potential Purchaser"), no later than 24-hours before the time the Court sets for the Sale Approval Hearing (the "Submittal Deadline"), must submit to the Seller a package (the "Offer Package") that includes all of the following items (the Proposed Purchaser shall be deemed a "Potential Purchaser" and the Agreement shall be deemed a "Qualified Offer"):

1.    A signed offer to purchase the Acquired Assets ("Offer"), meeting the requirements set forth below.

2.    A written acknowledgement that it agrees to all the terms set forth in these Sale Procedures and agrees that the Offer constitutes an irrevocable offer and is binding on the Potential Purchaser until the Sale Approval Hearing;

3.    Written evidence it has obtained authorization and approval from its Board of Directors (or comparable governing body), if necessary, with respect to the submission of its Offer and acceptance of the terms of sale set forth in these Sale Procedures, or representations that no such authorization or approval is required;

4.    Financial statements and/or written evidence of a financing commitment or other evidence, satisfactory to Debtors and any creditors' committee of the financial ability to close pursuant to its Offer by the date set forth in the Offer (provided, however, that the closing of the sale shall not be contingent in any way on the Potential Purchaser procuring financing);

5.    Earnest Money of $50,000, in the form of a wire transfer to DeMarb Brophy LLC escrow account, which will be returnable to the Potential Purchaser, as set forth below.

6.    The identity of the individual authorized to bid at Auction and <u>contact information for such individual.</u>

**EXHIBIT B**

C.    Competing Offers:

    1.    Shall not contain a break-up fee or any other expense reimbursement;

    2.    Shall contain a minimum purchase price of $900,000 plus the Inventory Amount for the Acquired Assets (the "Initial Overbid");

    3.    Shall contain a disclosure of the identity of each entity or person submitting the Offer or otherwise participating in the Offer, and the complete terms of any such participation;

    4.    Shall be created by using the APA, and redlining the APA to create the Offer; and

    5.    Shall not provide for a commission to be paid from the purchase price.

D.    Qualified Offers.

    1.    Debtors, together with a creditors' committee, if any, will analyze each Offer based on the criteria detailed above to determine which Offers will be treated as "Qualified Offers" based on the capability of the Potential Purchaser to ultimately close on the purchase of the real estate and the amount of the Offer. Debtors may, at any time, contact Potential Purchasers to discuss or clarify terms, to indicate any terms which may need to be modified to conform an Offer to a Qualified Offer, or to negotiate terms.

    2.    The APA is a Qualified Offer. If no additional Qualified Offers are made, Debtors intend to close on the sale to CDF pursuant to the terms of the APA.

    3.    If one or more than one Qualified Offers are submitted in addition to the Agreement, as quickly as possible in light of the required timelines, Debtors will submit to each Potential Purchaser with Qualified Offers the amount of the Offer the Debtors has deemed to be the highest Qualified Offer (the "Highest Qualified Offer"), as determined by the Debtors in her best business judgment and after consultation with any creditors' committee.

    4.    Debtors, in the exercise of their reasonable business judgment, reserve the right to reject any Offer if such Offer:

        i.    Is not received by the Submittal Deadline;

ii. Is subject to any due diligence, financing contingency or other contingency (including representations, warranties, covenants and timing requirements) or an estimated time to close which is materially different from those in the Agreement and which the Debtors do not believe may be adjusted pursuant to the Auction section of these Sale Procedures, below; or

iii. Provides less economic benefit to the Debtors' estates.

5. Any Offer rejected pursuant to this Paragraph shall not be deemed to be a Qualified Offer.

## II.   AUCTION

A. The Auction will be held after the Submittal Deadline and before the Sale Approval Hearing at a date and time set by Debtors.  The Auction may be postponed by announcement by Debtors, but not for more than three (3) business days. The Auction may be conducted by telephone, at the discretion of Debtors.

1. Debtors may establish and announce rules on the conduct of the Auction and may modify those rules in its discretion; provided that such rules are in all material respects consistent with these Sale Procedures and are designed to promote the most competitive bidding process.

2. All Potential Purchasers with Qualified Offers shall be eligible to participate in the Auction.

3. Bidding shall begin with Debtors' *announcement of the Potential Purchasers and of the Highest Qualified Offer*.  Debtors shall request additional bids with an initial minimum overbid of at least $50,000 over the Highest Qualified Offer (the "Initial Over Bid"). At the same time, the Debtors will announce the adjusted amount of all other Qualified Offers.

4. After the Initial Over Bid, all additional bids must be in increments of not less than $25,000.

5. Debtors will establish reasonable time periods between bids to allow Potential Purchasers an opportunity to bid. Bidding will be deemed to be closed when Debtors requests additional bids three times without a

3

response and announces the bidding closed. The final bid shall be the **"Prevailing Bid"** and the Qualified Bidder making such bid will be the **"Prevailing Bidder."**

B.   No additional Bids will be considered after the end of the Auction.

C.   EACH BID SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE PREVAILING BIDDER UNTIL COURT APPROVAL OF THE SALE PURSUANT TO THE PREVAILING BID.