# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WISCONSIN

IN RE:                                     Chapter 11

**DDS 2019, LLC,**                         **Case No.: 18-13912**
DDD 2019, LLC,                             Case No.: 18-13915

   Debtors.

                                           Jointly Administered

## JOINT COMBINED DISCLOSURE STATEMENT
## AND FIRST AMENDED PLAN

Dated this ⎯10⎯th day of July, 2019.

This Joint Combined Disclosure Statement and First Amended Plan of Reorganization ("Amended Plan") is submitted on behalf of DDS 2019, LLC ("DDS") and DDD 2019, LLC ("DDD" and, together, the "Debtors" or the "Company"), as Debtors and Debtors-in-Possession in the above-captioned cases, (1) for determination by the Court that the Disclosure Statement contains adequate information, as required by § 1125 of the Code, to allow Claimants and other parties-in-interest to make an informed decision about the Plan described herein (the "Plan"); and (2) for confirmation of the Plan.

The Joint Combined Disclosure Statement and Plan was transmitted to all known Claimants[1]. The purpose of the Disclosure Statement portion is to disclose information deemed to be material, important, and necessary to allow Claimants to make informed decisions as to whether to file an objection to the Disclosure Statement and/or Plan, and whether to vote to accept the Plan. Receipt of this material does not necessarily mean that the Claim of the party receiving the material is the holder of an Allowed Claim, unless the allowance of such Claim has already been adjudicated.

The Plan and this Amended Plan (together, the "Plan") provide for payment of all non-insider Allowed Claims in full, and for such payment to be completed within fourteen (14) days of the Effective Date, or within fourteen (14) days of when a Disputed Claim becomes an Allowed Claim, whichever is earlier. Accordingly, Debtors are asking for Confirmation of the Plan and urge all creditors entitled to vote to accept the Plan.

---

[1] All terms are defined as set forth in Section III, herein.

Debtors represent that the Disclosure Statement and the Amended Plan are endorsed by Debtors' management and President, as well as by Serralles USA, LLC.

Section 15 of the Disclosure Statement and Plan contains certain release, exculpation, and injunction language.  This Amended Plan is being filed to further limit the release, exculpation and injunction language from that in the Plan filed on June 6, 2019, as well as to update Schedule II.  You should read the provisions contained in Section 15 very carefully so that you understand how confirmation and consummation of the Plan will affect you and any claim, interest, right, or action you may have against any of the Debtors and the other Released Parties.  **THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND BY ALL OTHER APPLICABLE LAW.**

### Combined Hearing on Approval of the Disclosure Statement and Confirmation of the Plan.

DDS and DDD are filing this Joint Combined Disclosure Statement and Plan of Reorganization because their assets and obligations are intertwined.  The Plan is straightforward and is a liquidating plan.  The Plan provides for payment in full of the principle amount due on all Allowed Claims against DDD.  Because DDD is a fully owned subsidiary of DDS, the Plan provides for distribution to DDS of the assets remaining in DDD after payment of DDD Allowed Claims.  Then, the Plan provides for payment in full of the principle amount due to all non-insider Allowed Claims against DDS.  Finally, the Plan provides for payment of the balance of all assets remaining in DDS to Serralles USA, LLC ("Serralles") on its Allowed Unsecured Insider Claim filed in DDS.

The Court has scheduled a combined hearing on approval of the Disclosure Statement and confirmation of the Plan for July 12, 2019 at 10:00 a.m. (the "Combined Hearing").  At the Combined Hearing, the Court may approve the Disclosure Statement portion of this Joint Combined Disclosure Statement and Plan and, if sufficient acceptances of the Plan are received and the statutory requirements of Section 1129 of the Code are met, enter an order confirming the Plan.

As a Claimant, you may have the right to vote to accept or reject the Plan.  Because the Plan satisfies all Allowed Claims except the Allowed Claim of Serralles in DDS, Debtors believe that the Plan represents the best available alternative for the holders of Allowed Claims.

The deadline for (1) returning your ballots voting on the Plan; (2) for objecting to approval of the Disclosure Statement; and (3) for objection to Confirmation of the Plan are all 4:00 p.m. (CST) on July 8, 2019. Objections to the Plan must be filed and served on counsel to DDS and DDD no later than 4:00 p.m. (CST) on July 8, 2019. If you are entitled to vote on the Plan under the Code, a ballot, printed on a different colored paper from all others in this package, is enclosed with copies of this Disclosure Statement and the Plan to allow you to vote on the Plan.

DDS and DDD urge you to read this Joint Combined Disclosure Statement and the Plan in full, and then encourage you to vote to accept the Plan.

Final approval of this Disclosure Statement is scheduled at the same time as Confirmation of the Plan, at the Combined Hearing. Even after final approval, the Court's approval of this Disclosure Statement constitutes neither a guaranty of the accuracy or completeness of the information contained herein, nor an endorsement of the merits of the Plan.

Debtors are private and closely held business entities, organized in the State of Wisconsin as limited liability companies. This Disclosure Statement has been prepared in accordance with § 1125 of the Code and Bankruptcy Rule 3016(c). It is not prepared in accordance with any federal or state securities laws, "blue sky" laws, or other applicable laws. This Disclosure Statement has not been filed with, nor has it been reviewed by, the Securities and Exchange Commission ("SEC") or any securities regulatory authority of any state. The Plan has not been approved or disapproved by the SEC nor has it been approved by any state securities commission. Neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offense.

Other than as explicitly set forth herein, creditors should not rely upon any information relating to the Debtors, the value of the Debtors' assets or the nature of the Debtors' liabilities. The Debtors have provided all financial information contained herein, and such information has not been the subject of a certified audit.

The contents of this Disclosure Statement should not be construed as legal, business, securities, or tax advice. **Each creditor is encouraged to consult its own legal counsel and accountant as to the legal, tax, and other matters concerning its claim or its treatment under the Plan.**

Pursuant to § 1126 of the Code, only holders of Claims that are "impaired" (as that term is defined in § 1124 of the Code) are entitled to vote to accept or reject a plan. In this Case, the holders of Class 1, Class 3 and Class 4 Claims are impaired and therefore entitled to vote to accept or reject the Plan.

# I.   BACKGROUND OF THE CASES

On November 21, 2018 (the "Petition Date"), Debtors filed their Petitions for protection pursuant to Chapter 11 of the Code and relief was granted. Debtors are continuing in possession of their property and winding down of their businesses pursuant to §§ 1107 and 1108 of the Code.

The Death's Door brand began its business operations in 2007 with two products, Death's Door Vodka and Death's Door Gin. Brian Ellison, the President of the Death's Door brand, started working with farmers on Washington Island, Wisconsin to grow crops and in turn find end products from the crops to produce and market. In 2009, Ellison founded Death's Door Spirits, LLC ("DDS"), now known as DDS 2019, LLC. Death's Door opened its distillery in Middleton in 2012, creating Death's Door Distillery, LLC ("DDD"), now known as DDD 2019, LLC (DDS and DDD are referred to, together, as "Debtors" or the "Company").

DDD is a wholly owned subsidiary of DDS. Originally, Ellison owned all the interests in DDS. Through a series of six offerings, the number of members in DDS grew to sixteen by 2016 with Ellison owning a 35.23% membership interest in DDS. In general, DDD was the operating company and DDS owned the intellectual property. Both DDD and DDS were liable on the secured debt.

As a brand, the Company's portfolio grew, and, on the Petition Date, the Company included five high-premium spirit brands, Death's Door Vodka, Death's Door Gin and Death's Door White Whiskey, Black Earth Bourbon and Wondermint, all of which use alcohol crafted in the mid-sized distillery in Middleton, Wisconsin.

DDD's maximum production volume was 140,000 proof gallons of spirits per year, but it never reached close to that capacity. In addition to increased overhead, DDD's problems with sales intensified in 2015 when sales dropped more than 50% of the previous year. Sales did increase some in 2016 and 2017, but DDD never operated the distillery at more than 40% capacity. DDD tried to grow sales to rectify its cash flow problems that started in 2015 but was never been able to do so.

Commencing on or about December of 2017, the Company retained an investment banking firm in an attempt to sell the Company's equity or some or all of its assets, without much success.

In order to generate cash flow for the Company, Serralles, the Company's former distributor and a member of DDS, purchased significant amounts of bulk whiskey from the Company each month during 2017 and early 2018. After Serralles USA stopped buying the bulk whiskey in March of 2018, the Company then lacked the cash necessary to continue operations indefinitely. DDS and Serralles entered into

an Amendment to Distribution Agreement effective as of April 1, 2018, to among other things, remove the State of Wisconsin from the territory identified in the Distribution Agreement. Effective as of October 31, 2018, Serralles terminated its distribution contract with the Company pursuant to the terms of such contract. The Company entered into a new distribution agreement for some states and started selling independently in other states. However, the termination of the Serralles contract, together with the uncertainty in the distribution network going forward, exacerbated the Company's dire cash flow situation and made the Case filings unavoidable. On the Petition Date the Company was unable to fund normal operations and had reduced its staff to seven (7) employees.

## II.    EVENTS OF THE CASES

On the Petition Date, Debtors filed a Motion for Two Orders: (1) Approving Sale Procedures, Form of the APA, Break-Up Fee and Scheduling Sale Approval; and (2) Authorizing Debtors to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances (the "Sale Motion"). The Sale Motion sought approval of sale procedures and a stalking horse asset purchase agreement, entered into on the Petition Date, with CDF Capital, LLC, for the sale of all of Debtors' operating assets, except for accounts receivable, for $700,000.00 plus the value of inventory existing at closing, estimated to be $500,000.00 on the Petition Date. After an active auction, the Court entered the Order (1) Authorizing Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Interests; (2) Authorizing Assumption and Assignment of Certain Unexpired Leases and Executory Contracts; (3) Approving Changes to Debtors' Names and Modifications to Caption (the "Sale Approval Order") on December 28, 2018 (Docket # 155). The sale to Midwest Custom Bottling, LLC ("MCB"), contemplated by the Sale Approval Order, closed on January 11, 2019 (the "Closing"). The final sale price paid at Closing was a total of $2,949,222.01, made up of $440,046.00 for inventory plus $2,485,000 for the other assets sold pursuant to the Sale Approval Order and underlying Asset Purchase Agreement, plus the payment of the Cure Amount to Bredeson/Bredeson I Partnership of $24,176.01.

After Closing, Debtors sought authority to complete substantial interim distributions to specific creditors. On February 25, 2019, the Court entered the Order Granting Motion for Authority to Complete Interim Distribution (Docket #218) and on April 24, 2019, the Court entered the Second Order Granting Motion for Authority to Complete Interim Distribution (Docket # 272)(together, the "Interim Distribution Orders"). Debtors completed the interim distributions required by the Interim Distribution Orders and in doing so, paid the following secured creditors:

| Margaret Ebeling | $37,618.87 |
|---|---|
| MG&E | $217,820.81 |
| Starion Bank | $290,951.32 |
| Toyota Financial | $3,145.25 |
| US Small Business Association | $692,014.57 |

In addition from the proceeds of the sale, Debtors paid $34,816.00 to Marketing Hub, LLC, returning cash of Marketing Hub, LLC used by Debtors, paid the breakup fee to the stalking horse bidder, and paid $15,000.00 to Midwest Custom Bottling, LLC, pursuant to the Order Approving Motion to Approve Administrative Claim (Docket # 232).

The Debtors' secured and priority creditors have been paid in full. Schedule II sets forth all known remaining Claims, along with an indication of whether such Claims are disputed.

DDS and DDD have both paid all of their post-petition ordinary course claims and expenses in full and within ordinary business terms. DDD has been collecting lagging accounts receivables since the closing and using such receivables to pay costs associated with the winddown, including professional fees. The net balance of such revenue and expenses reflected in the estimated balance in the DIP account at confirmation on **Schedule VII**. In addition, DDD made post-petition payments on the pre-petition claims of employees and utilities, as provided by order of the Court, and made certain payments to other creditors on pre-petition obligations pursuant to order of the Court.

### III.    DEFINITIONS

For purposes of the Plan and Disclosure Statement, capitalized terms shall have the meanings set forth below, unless the context clearly indicates otherwise. All other terms not defined herein shall have the definitions assigned by the Code, or, if not defined therein, in common usage. Accounting terms not otherwise defined herein, or partly defined herein to the extent not so defined, shall have the respective meanings given to them under FASB and GAAP rules.

1.1    "**Administrative Expense Claim**" shall mean a Claim for compensation, charges, and/or expenses under § 503(b) of the Code that is entitled to priority in payment pursuant to § 507(a)(1) of the Code.

1.2    "**Allowed Administrative Claim**" shall mean all or any portion of an Administrative Claim that is an Allowed Claim, including but not limited to Administrative Expense Claims pursuant to § 503(b)(9) of the Code.

1.3    "**Allowed Claim**" shall mean all or any portion of any Claim:

(a)    as to which no proof of claim has been filed with the Court and the liquidated and non-contingent amount of which is scheduled by the Debtors as undisputed and is not subject to a counterclaim or a right of setoff by the Debtors; or,

(b)    as to which a proof of claim has been timely filed in a liquidated amount with the Court, or late filed with leave of the Court, after notice and a hearing, provided that:    (1) no objection to the allowance of such Claim, motion to expunge such Claim, counterclaim or right of setoff or recoupment has been interposed by any party-in-interest by the Claims Objection Deadline; or, (2) if such objection, motion, counterclaim or right of setoff or recoupment has been filed or asserted, such objection, motion, counterclaim or right of setoff or recoupment has been concluded by a Final order allowing all or a portion of such Claim.

1.4    "**Avoidance Action**" shall mean any and all Claims or causes of action made under or pursuant to §§ 544, 545, 546, 547, 548, 549, 550, 551 or 553 of the Code, including any Claims or causes of action brought under Chapters 180 or 242 of the Wisconsin Statutes.

1.5    "**Bar Date**" shall mean a date established by a Final Order as the last date for filing proofs of claim against the Debtor or Debtors, except as the Bar Date may be extended in specific instances by an additional Final Order of the Court.

1.6    "**Business Day**" shall have the meaning as defined in Rule 9006(a)(6), Federal Rules of Bankruptcy Procedure, and for ease of reference herein, shall mean any day except Saturday, Sunday or any Legal Holiday.

1.7    "**Case**" shall mean the case for reorganization of each of the Debtors commenced by the filing of Voluntary Petition Under Chapter 11 on or about the Petition Date, now pending in the Court, and entitled, *In Re: DDS 2019, LLC* Case No. 18-13912, and *In Re: DDD 2019, LLC*, Case No. 18-13915.

1.8    "**Chapter 11**" shall mean Chapter 11 of Title 11, United States Code.

1.9    "**Claimant**" shall mean the holder of a Claim.

1.10    "**Class**" shall mean a category of holders of Claims or Interests defined in Sections V and VI of the Plan.

1.11    "**Code**" shall mean Title 11, United States Code, Section 101, et seq., as amended.

1.12   "**Confirmation Date**" shall mean the date on which the Confirmation Order is entered on the docket of the Court.

1.13   "**Combined Hearing**" shall mean the hearing held by the Court, after notice, on approval of the Disclosure Statement and confirmation of the Plan.

1.14   "**Confirmation Order**" shall mean the Final Order of the Court confirming the Plan, pursuant to § 1129 of the Code.

1.15   "**Court**" shall mean the United States Bankruptcy Court for the Western District of Wisconsin acting in this case, including the United States Bankruptcy Judge presiding in the case of the Debtors, and/or the United States District Court of which said Bankruptcy Court is a unit.

1.16   "**Disputed Claim**" shall mean any Claim:

(a)     to which an objection has been filed with respect to all or any portion of such Claim, or to which an objection, application or adversary proceeding to equitably subordinate or otherwise limit recovery of all or any portion of such Claim has been filed, on or before the Effective Date or any other date fixed by Final Order of the Court and which objection or application has not been withdrawn or determined by Final Order of the Court;

(b)     that is listed on the Debtors' Schedules of assets and liabilities as "disputed", "contingent" or "unliquidated" in said Schedules and as to which a proof of claim has not been timely filed with the Bankruptcy Court by the Bar Date or pursuant to Court Order; or,

(c)     that is not otherwise an Allowed Claim.

1.17   "**Disputed Claims Escrow**" shall mean the escrow for Disputed Claims set forth in Section VI.A herein.

1.18   "**Effective Date**" shall mean the date that an Order confirming this Plan of Reorganization becomes a Final Order.

1.19   "**Estate**" shall mean the estate of each of the Debtors created in the Case by operation of § 541 of the Code.

1.20   "**Exculpated Parties**" shall mean (i) each of the Debtors, (ii) each of the Reorganized Debtors, (iii) the current members and officers of the foregoing, and (iv) the attorneys and accountants, each in their respective capacities as such, of each of the foregoing.

1.21   "**Final Order**" shall mean an order or a judgment that has not been reversed, stayed, modified or amended and as to which:

(a)     the time to appeal or seek review, re-argument or rehearing has expired and has not been extended and as to which no appeal or petition for certiorari, review or rehearing is pending, or,

(b)     if an appeal, review, re-argument, rehearing or certiorari of the order or judgment has been sought, the order or judgment has been affirmed or the request for review, re-argument, rehearing or certiorari has been denied and the time to seek a further appeal, review, re-argument, rehearing or certiorari has expired, as a result of which such order or judgment shall have become final and non-appealable in accordance with applicable law.

1.22    "**Lien**" shall have the meaning assigned to such term in the Code.

1.23    "**Plan**" shall mean this Plan of Reorganization, filed by the Debtors, in its present form, or as it may be further amended, supplemented, or modified from time-to-time.

1.24    "**Person**" means an individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust, estate, unincorporated organization, governmental unit, government (or agency or political subdivision thereof), or other entity, including, without limitation, a Debtor.

1.25    "**Petition Date**" shall mean November 21, 2018.

1.26    "**Property of the Estate**" shall have the meaning assigned to such term in § 541 of the Code.

1.27    "**Released Parties**" or "**Released Party**" shall mean:  (i) each of the Debtors, (ii) each of the Reorganized Debtors, (iii)  Brian Ellison, individually and as a member of the Debtors, (iv) Destilería Serrallés, Inc. and Serrallés USA, LLC, (v) the current members, officers, attorneys and accountants, each in their respective capacities as such, of each of the foregoing.

1.28    "**Reorganized Debtors**" shall mean each Debtor after the Effective Date.

1.29    "**Unsecured Claim**" shall mean a Claim arising on or before the Petition Date for an unsecured debt, demand or liability of any character whatsoever, including, without limitation, any Claim secured by a Lien which is determined by the Court to be preferential or otherwise avoidable, any Claim arising from the recovery by the Estate of any Avoidance Actions, or any Claim in excess of the Claimant's Allowed Secured Claim.

## IV.    RULES OF INTERPRETATION

1.1.    Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural;

1.2.    Unless otherwise provided in the Plan and Disclosure Statement, any reference in the Plan and Disclosure Statement to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions;

1.3.    Unless otherwise provided in the Plan and Disclosure Statement, any reference in the Plan and Disclosure Statement to an existing document or exhibit means such document or exhibit, as it may have been or may be amended, modified or supplemented pursuant to the Plan and Disclosure Statement;

1.4    Unless otherwise specified in the Plan and Disclosure Statement, any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns;

1.5    The words "hereof," "herein," and "hereunder" and words of similar import when used in this Plan shall refer to this Plan as a whole and not to any particular provision of this Plan;

1.6    Unless otherwise specified in the Plan and Disclosure Statement, the words "Article," "Section," "Clause," and "Exhibit" refer to articles, sections, clauses and exhibits of or to this Plan and Disclosure Statement; and,

1.7    The rules of construction set forth in § 102 of the Code shall apply.

1.8.    The headings contained in this Plan are for the convenience of the reader and for reference only, and such headings shall not limit or otherwise affect in any way the meaning or interpretation of the Plan.

1.9.    All references in this Plan to any one of the masculine, feminine, or neutral genders shall be deemed to include references to both such other genders.

1.10.    All exhibits and schedules attached to this Plan are, by this reference, hereby incorporated into this Plan.

1.11.    In computing any period of time prescribed or allowed by this Plan, reference should be made to Rule 9006, Federal Rules of Bankruptcy Procedure.

## V.    UNCLASSIFIED AND ADMINISTRATIVE CLAIMS

The Plan contemplates payment in full of all Allowed Claims of non-insider creditors within fourteen (14) days of the Effective Date (the "Payment Date"), and payment of (1) at least $1,00,000.00 to Serralles within fourteen (14) days of the Effective Date; and (2) payment to Serralles of the balance of cash and other assets remaining, as described below, within thirty (30) days of the DDS Case being closed.

Unclassified Claims consist of various Administrative Expense Claims, including: (a) Claims for professional fees and expenses related to the Case that are subject to approval under Code § 330 that Debtors estimate will total approximately $260,000.00 (of these, $190,688.31 have been paid pursuant to approved interim fee requests); and (b) other Claims that are incurred by either Debtor after the Petition Date and that are incurred in the ordinary course of business, including sales taxes (virtually all of these claims have been paid by in full in the ordinary course of business).

Any unpaid Allowed professional fees and expenses, and all other Administrative Expense Claims arising outside the ordinary course of business will be paid in full on or before the Effective Date from funds on hand. If such claims remain subject to Court approval after the Effective Date, such claims shall be paid on the date on which such Claim becomes an Allowed Claim, unless the applicable Debtor and the holder of such a Claim mutually agree to payment on another later date.

U.S. Trustee Fees, payable under 28 U.S.C. § 1930, will be paid when due through confirmation and in accordance with Code § 1129(a)(12) until the Case is converted, dismissed or closed. Fees incurred in the quarter that the case is closed will be paid within 30 days of the case closure date.

DDS and DDD retained DeMarb Brophy LLC ("DB") as its primary insolvency counsel in these Cases. DB has filed five interim fee applications for the time period from the Petition Date through April 30, 2019, for a total of $195,506.00 in fees and $1,944.73 in expenses for a total of $197,450.73. The remaining balance owed to DB from April 1, 2019, through the Effective Date, plus the holdback for fees prior to April 1, 2019, may be paid either pursuant to additional interim fee application orders, or on the Effective Date or upon approval of DB's final fee application, whichever is later. Debtors estimate that these post-April 1, 2019, fees and expenses will not exceed $70,000.00.

DDS and DDD employed Statz Accounting & Tax Services, LLC ("Statz") as its accountants during the Case. Statz has filed two interim fee applications for the time period from the Petition Date through February 28, 2019, for a total of $2,025.01 in fees and costs. The remaining balance owed to Statz from March 1, 2019, through the Effective Date, plus the holdback of fees prior to March 1, 2019, will be paid either on the Effective Date or upon approval of Statz's final fee application, whichever is later. Debtors estimate that Statz fees will be $500.00 per month.

DDS and DDD employed BDO USA, LLC ("BDO") as its tax accountants during the Case. BDO has filed one interim fee application for the time period from the Petition Date through March 21, 2019, for a total $13,895.00 in fees and $600.00 in

costs. The remaining balance owed to BDO from March 21, 2019, through the Effective Date, plus the holdback of fees, will be paid either on the Effective Date or upon approval of BDO's final fee application, whichever is later.  In addition, Debtors will need to pay for the completion of their final income tax returns.  BDO estimates this will work will cost $8,500.00.

All fees and expenses incurred by Debtors for payment to professionals after the Effective Date shall be paid by the Reorganized Debtors.

## VI.    TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**Class 1 (Unsecured Claims of DDD)**.   Class 1 consists of the Allowed Unsecured Claims of DDD as listed on **Schedule II**.  All Allowed Class 1 Claims will be paid in full within fourteen (14) days of the Effective Date.   If any objection or opposition is made to a Claim, and such objection is pending on the Effective Date, then no payment or distribution shall be made to the Claimant holding such Disputed Claim until the Court enters an order determining the validity, classification, and amount of such Claim, and that such order becomes a Final Order.  If DDD has not filed an objection to a Claim by the Effective Date, then filed Claims shall be deemed Allowed subject to orders already entered by the Court adjusting claims and making them Allowed Claims.  DDD shall fund the Disputed Claims Escrow made up of the amount sufficient to pay in full, based on the amount stated by the Claimant, of all Class 1 Claims that are Disputed as of the Effective Date.   Debtors will pay the principal amount of all Class 1 Claims that are Disputed on the Effective Date from the Disputed Claims Escrow in full within fourteen (14) days of such claims becoming Allowed Claims.

Class 1 Claimants will receive no interest on their Claims.

Class 1 is impaired.

B.    **Class 2 (Equity in DDD):**  Class 2 consists of the interest of DDS, the holder of the equity interest in DDD.  On the Effective Date, DDD will distribute all assets remaining in DDD, including cash and any other remaining assets not yet liquidated, to DDS except for Disputed Claims Escrow.  DDD will distribute any funds remaining in the Disputed Claims Escrow to DDS within five (5) days of payment of the last Class 1 Claim that becomes an Allowed claim, or within five (5) days of the entry of an order disallowing the last Class 1 Claim, as applicable.  DDS shall retain its equity interests in DDD.

Class 2 is not impaired.

C.    **Class 3 (Non-Insider Unsecured Claims of DDS)**.  Class 3 consists of the Allowed Non-Insider Unsecured Claims of DDS as listed on **Schedule II**.  All Allowed Class 3 Claims will be paid in full within fourteen (14) days of the Effective

Date.  All Class 3 Claims will be Allowed Claims on the Effective Date.  Class 3 will receive no interest on their claims.

Class 3 is impaired.

D.    **Class 4 (Unsecured Claim of Serralles USA, LLC)**.  Class 4 consists of the Allowed Unsecured Claim of Serralles USA, LLC, filed against DDS in the aggregate amount of $5,135,913.31.

The assets remaining in DDS after payment of Class 3 Claims will be insufficient to pay the Allowed Class 4 Claim in full.  Class 4 will receive payment of $1,000,000 within fourteen (14) days of the Effective Date.  In addition, within five (5) days of DDS filing a motion with the Court to close its Case, DDS will fund an escrow for trailing professional fees and other administrative expenses in the amount of $50,000 (the "Post-Closing Escrow").  When it funds the Post-Closing Escrow, DDS will distribute the balance of its assets to Class 4 including cash and, to the extent any of its assets have not been liquidated at that time, an assignment of the balance of its assets to Class 4.  At a time agreed upon between DeMarb Brophy and Serralles, DeMarb Brophy will distribute any balance remaining in the Post-Closing Escrow to Serralles.

Class 4 is impaired.

E.    **Class 5 Claim:**  Class 5 consists of the equity interests in DDS.  Equity will retain all equity interests in DDS post-confirmation.

Class 5 is not impaired.

## VII.    MEANS OF IMPLEMENTING THE PLAN.

A.    **Power and Authority of the Reorganized Debtors**.  All Property of the Estates will re-vest in the Reorganized Debtors on the Confirmation Date subject to the terms of this Plan, free and clear of all liens, claims, and encumbrances.  The Reorganized Debtors shall take possession of and manage the former Property of the Estates and shall continue to administer the provisions of this Plan.  The Reorganized Debtors shall have all the rights and powers of a trustee under Chapter 11 of the Code, pursuant to § 1107 of the Code.

B.    **Operation of Debtors' Organization.**  The Reorganized Debtors shall have full authority to operate the Reorganized Debtors' organization pursuant to this Plan.  Each of the Reorganized Debtors shall have full authority to take any action necessary to wind-up its affairs, liquidate, transfer, or abandon assets, and dissolve and terminate the existence of such Reorganized Debtors in a manner and in accordance with the best means, as determined in the sole business judgment of each

Reorganized Debtor, to maximize assets and minimize expenses or costs associated with such liquidation under applicable state laws and in accordance with the rights, powers, and responsibilities conferred by the Bankruptcy Code, this Plan and any order of the Court.  After Allowed Claims are paid, the Reorganized Debtors may choose to terminate the legal existence of either or both of the Reorganized Debtors, if doing so is in their best interests, and without further notice or hearing.

C.    **Post-Confirmation Management**.    The Reorganized Debtors will operate under the direction of Brian Ellison, President of each of the Reorganized Debtors.  Starting on August 1, 2019, and continuing through September of 2019, Ellison shall receive $4,000.00 per month for his services to the Reorganized Debtors. On and after October 1, 2019, Ellison shall receive $200.00 per hour for his services to the Reorganized Debtors.  The Reorganized Debtors will retain the services of other professionals as needed.

D.    **Assets to Fund the Plan.**  The list of assets to be used to pay Allowed Claims is attached hereto as **Schedule VII**.  The list of assets that Debtors anticipate will remain with and vest in the Debtors post-confirmation is attached hereto as **Schedule VII**.  The values on Schedule VII are not binding on the Debtors or Reorganized Debtors. The values reflect and rely upon numerous assumptions, including confirmation, consummation, and implementation of the Plan in accordance with its terms.  Moreover, unanticipated events and circumstances that occur subsequent to the filing of this Disclosure Statement may also affect the actual values of the assets.

## VIII.  INSIDER TRANSACTIONS AND AVOIDANCE ACTIONS

Brian Ellison received distributions from DDD, both before and after the Petition Date, in the form of cash and benefits in return for services to DDD and DDS. Debtors had a long-term relationship with Serralles that was many faceted including Serralles being a member of DDS, a representative of Serralles serving on the Company's board, Serralles being Debtors' liquor distributor, Serralles buying bulk whiskey from Debtors, and otherwise being involved with Debtors' business.  Prior to the Petition Date, Debtors sold a brand, Kringle Cream, to Marketing Hub, LLC. After selling the brand to Marketing Hub, LLC, DDD continued to sell Kringle Cream under its license and on behalf of Marketing Hub, LLC.  All transactions between DDD and Marketing Hub, LLC have concluded and have been reconciled.  Marketing Hub, LLC is owned by Margaret Ebeling, a former employee and Brian Ellison's domestic partner.  As an employee, Margaret Ebeling received a salary and other payments from Debtors.

Debtors have reviewed their books and records and have not found any Avoidance Actions that should be pursued in their best business judgment.

# IX.    SELECTED CODE REQUIREMENTS

The Code imposes certain legal and technical requirements to be met for a Chapter 11 plan to be confirmed.  To confirm a plan, the Court must find that these requirements, set forth in either § 1129(a) or (b), have been met by the proposed Plan.  The Court must undertake an independent evaluation of the Plan's feasibility and whether the other statutory requirements have been met before entering an Order Confirming the Plan.

### A.    Best Interest Test.

Before confirming the Plan, the Court must determine that the Plan provides to each member of each impaired class of Allowed Claims a recovery that is at least equal to the distribution that such member would receive if the assets of the Debtor were to be liquidated on the Effective Date under Chapter 7 of the Bankruptcy Code. The creditors are receiving more than they would receive in a Chapter 7 case. Serralles has agreed as part of this Plan to subordinate its Allowed Claim to all other Allowed Claims and, without this agreement, distribution on unsecured claims would be pennies on the dollar.  **Schedule II and VII**, taken together, provide the information sufficient to complete a liquidation analysis.  The best interest test is satisfied.

### B.    Feasibility and Administrative Expense Claims.

Under Code § 1129(a)(11) of the Code, the Court may only confirm the Plan if it is "feasible", which means that it is not likely to be followed by a liquidation, or the need for further financial reorganization, of the debtor or its successor.  As shown on **Schedule II and VII**, Debtors will have sufficient cash on the Effective Date to pay non-insider Allowed Claims in full and to reserve sufficient funds to pay any non-insider Disputed Non-Insider Claims in full when they become Allowed Claims. Because the Plan can be implemented using cash on hand, the Plan is not likely to be followed by the further liquidation of, or the need for further financial reorganization of, the Debtor.  Therefore, the Plan satisfies § 1129(a)(11) of the Code.

### C.    Cram Down.

Before the Court may confirm the Plan, the Plan must either be accepted by each impaired class of Claims, or it must be confirmable under the "cram down" provisions of § 1129(b) of the Code.  On its face, Debtors are proposing to pay all non-insider Allowed Claims in full and is filing this Plan with the agreement of Class 4.  Therefore, § 1129(b) of the Code is either satisfied or not applicable.

## X.    FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain expected federal and state income tax consequences of the implementation of the Plan.  No opinion of counsel has been obtained, and no ruling has been requested or obtained from the Internal Revenue Service with respect to any of the tax aspects of the proposed Plan.  The discussion set forth herein about such aspects is not binding upon the Internal Revenue Service.  CREDITORS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE TAX CONSEQUENCES TO EACH OF THEM, RESPECTIVELY, UNDER FEDERAL AND APPLICABLE STATE AND LOCAL TAX LAWS, RELATIVE TO THE CONFIRMATION AND CONSUMMATION OF THE PLAN.

### A.    Tax Risk Factors to Creditors Generally.

Creditors may be required to recognize income or may be entitled to a deduction as the result of the implementation of the Plan, depending upon how each creditor treated their respective claims for tax purposes prior to the Plan's implementation.  The exact tax treatment for each claimant will depend on each creditor's method of accounting and the nature of each Claim in the hands of the creditor.  Generally, a creditor will recognize gain or loss equal to the difference between the amount of cash received and the creditor's tax basis in the Claim.  Such gain or loss may be a capital gain or loss depending upon the creditor's particular tax situation and the nature of the Claim in the creditor's hands.  Gain recognized by a creditor with respect to a Claim for which a bad debt deduction has been claimed generally will be treated as ordinary income to the extent of any such prior deduction.

### B.    Tax Consequences to the Debtors.

Although the Debtors may have theoretical tax consequences as a result of the Plan, they will utilize operating losses to mitigate against such consequences.

## XI.    RISK FACTORS

Creditors will receive payment under the Plan as provided in the Plan only if the conditions to effectiveness of the Plan are met.  Plan confirmation and effectiveness are subject to certain risks.

### A.    **Confirmation of the Plan**.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Regardless of whether all impaired Classes of Claims accept the

Plan, it is possible that the Court, which sits as a court of equity and by statute may exercise substantial discretion, may not confirm the Plan. Section 1129 of the Code sets forth the requirements for confirmation and requires, among other things:  (1) that the Plan has classified Claims in a permissible manner; (2) that the contents of the Plan comply with the requirements of the Code; (3) that the Debtors have proposed the Plan in good faith; (4) that the confirmation of the Plan will not be likely to be followed by a need for further financial reorganization of the Debtors; and, (5) that the value of distributions to dissenting creditors not be less than the value of distributions such creditors would receive if the Debtors were to be liquidated under Chapter 7 of the Code.  Debtors believes that all of these conditions have been or will be met.

There can be no assurance, however, that the Court would confirm the Plan. Further, any objection to the Plan by a creditor or equity interest holder could prevent or delay confirmation of the Plan.  Although Debtors believe that the Plan will meet such challenges, there can be no assurance that the Court will reach the same conclusion.  Additionally, there can be no assurance that modifications to the Plan will not be required for confirmation, or that any such modifications would not require a re-solicitation of acceptances.

B.   **Disputed Claims**.

A small number of Claims remain in dispute, and the total amount of Claims (including Disputed Claims) may exceed the expectations assumed in the drafting of the Plan.

## XII.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

Debtors have rejected, or assumed and assigned as applicable, all known contracts and leases.  All parties to known contracts and leases have received notice of such rejection and had the opportunity to file a rejection damages claim by the Claims Bar Date.  To the extent that executory contracts and unexpired leases have not previously been rejected, assumed, or assumed and assigned by Final Order of the Court, all of such executory contracts and unexpired leases entered into before the Petition Date are deemed to be rejected under the Plan as of the Effective Date.

## XIII.   RETENTION OF JURISDICTION.

Until the Chapter 11 Cases are closed, the Court retains jurisdiction to ensure that the purposes and intent of this Plan are carried out, to hear and determine all Claims against the Debtors/Reorganized Debtors, and to enforce all causes of action that may exist on behalf of the Debtors/Reorganized Debtors.  In addition, the Court retains jurisdiction to amend or modify the Plan to the extent and under the

circumstances that the Court deems appropriate, as permitted by the Court and the Federal Rules of Bankruptcy Procedure.

Notwithstanding Confirmation of the Plan or occurrence of the Effective Date, the Court also retains jurisdiction for the following purposes:

A.     To consider any modification to the Plan, or to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Order Confirming the Plan, to the extent necessary to carry out the purposes and intent of the Plan;

B.     To hear and determine any objections to the allowance of Claims and requests for estimation of Claims;

C.     To hear and determine any and all applications, adversary proceedings, motions, and other contested matters not resolved in the Plan;

D.     To hear and determine any and all applications for compensation of professional services and disbursements, and any other similar fees incurred prior to the Confirmation Date;

E.     To enforce the terms and provisions of payments, rights, and interests required or created by the Plan or by earlier orders of the Court; and,

F.     To enter any order necessary to consummate, interpret, and affect the provisions of the Plan and the Order Confirming the Plan, or as may otherwise be required by the Code.

## XIV.   PAYMENT OF U.S. TRUSTEE FEES.

The Reorganized Debtors will pay all post-confirmation fees to the United States Trustee when due as required by law. The property of any of the Debtors may be used to pay such fees for any other of the Debtors. On a combined basis, the Debtors will retain sufficient amounts with their general operating expenses to pay such fees.

## XV.   SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.     **Compromise and Settlement of Claims and Controversies**. Pursuant to § 363 and 105 of the Code in consideration for the distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims and controversies relating to the contractual, legal, and

subordination rights that a holder of a Claim may have with respect to any Allowed Claim, or any distribution to be made on account of such Allowed Claim. The entry of the Confirmation Order shall constitute the Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Court that such compromise or settlement is in the best interests of the Debtors, the Estates, and holders of Claims and is fair, equitable, and reasonable. In accordance with the provisions of this Plan, pursuant to § 363 of the Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against them and causes of action.

> **B.**    **Full and Final Satisfaction of All Claims and Release.**  Pursuant to § 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan, the distributions, rights and treatment that are provided in this Plan shall be in full and final satisfaction, settlement, release and discharge, as of the Effective Date, of all Claims and causes of action of any nature whatsoever, including any interest accrued on Claims, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise that are based on or relating to, or in any manner arising from, in whole or in part, the Cases, the subject matter of the Cases, or the transactions or events giving rise to the Cases, any Claim that is treated in this Plan or could have been treated in this Plan, the restructuring of Claims before or during the Cases, the negotiation, formulation, or preparation of this Plan, the Disclosure Statement, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims. This release includes but is not limited to demands, liabilities, and causes of action that arose before the Effective Date and before the Petition Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date or the Petition Date including personal guarantees given by one or both of the Debtors, and all debts of the kind specified in §§ 502(g), 502(h) or 502(i) of the Bankruptcy Code. This release is effective whether or not: (1) a Proof of Claim is filed or deemed filed pursuant to § 501 of the Code; (2) a Claim based upon such Claim, debt or right is Allowed pursuant to § 502 of the Code; or (3) the holder of such a Claim has accepted this Plan. Except as otherwise provided herein, any default by any Debtor with respect to any Claim that existed before or on account of the filing of the Chapter 11 Case shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all claims subject to the Effective Date occurring, except as otherwise expressly provided in this Plan.

> **C.**    **Releases by the Debtors.**  Pursuant to § 1123(b) of the Code and except as otherwise specifically provided in this Plan, for good and valuable consideration, including the services of the Released Parties to facilitate the reorganization of the Debtors, as of the Effective Date the Released Parties are deemed released and discharged by each of the Debtors, each of the Reorganized Debtors and each of the

Estates from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that any of the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or other Person, based on or relating to, or in any manner arising from, in whole or in part, any of the Debtors, the Cases, the subject matter of, or the transactions or events giving rise to the Cases, any Claim that is treated in this Plan or could have been treated in this Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring of Claims before or during the Cases, the negotiation, formulation or preparation of this Plan, the Disclosure Statement, other than such Claims against a Released Party arising out of or relating to any act or omission of such party constituting willful misconduct. or gross negligence.

D.    **Exculpation**.  Each Exculpated Party is hereby released and exculpated from any act or omission accruing after April 1, 2018, in connection with, relating to, or arising out of the Debtors' in or out of court restructuring efforts, the Cases, formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement or this Plan, the filing of the Cases, the pursuit of Confirmation of this Plan, the administration and implementation of this Plan, or the distribution of property under the Plan or any other related agreement, except for gross negligence or willful misconduct (to the extent such duty is imposed by applicable non-bankruptcy law), but in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan.  The Exculpated Parties have, and upon Confirmation of this Plan shall be presumed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code and applicable non-bankruptcy law, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

E.    **Injunction**.    From and after the Effective Date, all Persons are permanently enjoined from commencing or continuing in any manner, any Cause of Action released or to be released pursuant to this Plan or the Confirmation Order. From and after the Effective Date, to the extent of the releases and exculpation granted in this Plan, all Persons who have held, hold, or may hold Claims that have been released, discharged, or are subject to exculpation shall be permanently enjoined from commencing or continuing in any manner against the Released Parties and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, or remedy released or to be released pursuant to this Plan and are permanently enjoined, from and after the Effective Date, from taking any of the

following actions: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Persons on account of or in connection with or with respect to any such Claims; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Persons or the property or estate of such Persons on account of or in connection with or with respect to any such Claims; and (4) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims released, settled, or discharged pursuant to this Plan.

All Persons shall be precluded from asserting against any of the Debtors or the Reorganized Debtors, and each of their assets and properties, any other Claims based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date. In addition, all Persons voting to accept the Plan and not opting out of the Release shall be precluded from asserting against the Released Parties, and each of their assets and properties, any other Claims based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

F.    **Term of Injunctions or Stays**.  Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Case pursuant to §§ 105 or 362 of the Code or any order of the Court, and extant on the Confirmation Date shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

G.    **Protection against Discriminatory Treatment**.  Consistent with § 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Persons, including governmental units, shall not discriminate against a Reorganized Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, a Reorganized Debtor or another Person with whom a Reorganized Debtor has or have been associated, solely because a Debtor has been a debtor under Chapter 11, has been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before a Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Case.

H.    **Release of Liens**.  Except as otherwise provided in this Plan, on the Effective Date, all pledges, or other security interests against any property of any of the Estates shall be fully released and discharged, and all the right, title and interest of any holder of pledges, or other security interests shall revert to the applicable

Reorganized Debtor and its successors and assigns.  For the avoidance of doubt, all Liens, pledges, or other security interests against any Property of the Estate shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

## XVI.   MODIFICATION OF THE PLAN

Either of the Debtors may alter, amend or modify the Plan under § 1127 of the Code, or as otherwise permitted, at any time prior to the Effective Date.  After the Confirmation Date and prior to the substantial consummation of the Plan, and in accordance with the provisions of § 1127(b) of the Code and with applicable Bankruptcy Rules, any of the Debtors and any party in interest may, so long as the treatment of holders of Claims under the Plan is not adversely affected, institute proceedings in the Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order and any other matters as may be necessary to carry out the purposes and effects of the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with Bankruptcy Rule 2002.

## XVII.  MISCELLANEOUS PROVISIONS

A.      **Binding Effect of the Plan**.

Pursuant to § 1141(a) of the Code, if the Plan or any plan is confirmed, the confirmed plan's provisions will bind the Reorganized Debtors and any Claimant and any member of the Debtors regardless of whether such Person's claim or interest is impaired under the Plan or whether such Person accepted the Plan.

B.      **Withdrawal or Revocation of the Plan**.

Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Plan's substantial consummation (as that term is defined in § 1101(2) of the Code). If either Debtor revokes or withdraws the Plan, it will be null and void and have no force or effect.  In such event, nothing contained in the current Plan shall be deemed to constitute a waiver or release of any Claim by or against either of the Debtors or to prejudice in any manner the rights of either Debtor in any further proceedings involving either Debtor.

C.      **Governing Law**.

Except to the extent that the Code or Bankruptcy Rules or other federal laws are applicable, and subject to the provisions of any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the construction, implementation and enforcement of the Plan and all rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Wisconsin, without giving effect to conflicts-of-law principles which would apply the law of a jurisdiction other than the State of Wisconsin or the United States of America.

## XVIII. CONCLUSION AND RECOMMENDATION

Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives because it will provide the greatest recovery to Claimants. Other alternatives would involve significant delay, uncertainty, substantial additional administrative costs, and the loss of an operating company and the jobs of those it employs. Debtors urge Claimants entitled to vote on the Plan to vote to accept the Plan.

DDS and DDD respectfully request approval of the Disclosure Statement and confirmation of this Plan.

[SIGNATURES ON FOLLOWING PAGE]

Respectfully submitted this _10th_ day of ___July___, 2019.

DDS 2019, LLC AND DDD 2019, LLC

By:_____

Brian Ellison, President

DeMARB BROPHY LLC
Attorneys for Debtors

By:_____

Rebecca R. DeMarb
State Bar Number:  1026221
P.O. Box 631
Madison, WI  53701
(608) 310-5500
rdemarb@demarb-brophy.com

**AMENDED**

**REMAINING CLAIMS**

| Debtor | Class | Claimant | Allowed |
|--------|-------|----------|---------|
| DDD | 1 | 1901 Inc. | $ 5,064.00 |
| DDD | 1 | Alliance Allstor | $ 685.75 |
| DDD | 1 | Aramark | $ 4,945.91 |
| DDD | 1 | Aras LLC | $ 68.00 |
| DDD | 1 | AW Media, LLC | $ 721.00 |
| DDD | 1 | Barnes, Inc. | $ 189.00 |
| DDD | 1 | Birko Corp | $ 76.28 |
| DDD | 1 | Breakthru Beverage Canada/PMA | $ 7,577.38 |
| DDD | 1 | Classic Color | $ 681.00 |
| DDD | 1 | Dept. of Safety and Professional Services | $ 200.00 |
| DDD | 1 | Dept. of Treasury - IRS | $ 600.00 |
| DDD | 1 | ECOLAB | $ 467.58 |
| DDD | 1 | Event Essentials | $ 2,764.63 |
| DDD | 1 | EZ Office Products | $ 290.52 |
| DDD | 1 | GL Dairy Biogas | $ 296.40 |
| DDD | 1 | Grunau | $ 195.00 |
| DDD | 1 | Gusmer Enterprises, Inc. | $ 165.46 |
| DDD | 1 | Home Depot Credit Services | $ 209.52 |
| DDD | 1 | Hoover Ferguson | $ 93.00 |
| DDD | 1 | Idea Source | $ 950.00 |
| DDD | 1 | Illingworth-Kilgust Mechanical | $ 1,174.65 |
| DDD | 1 | Imperial Packaging | $ 2,962.48 |
| DDD | 1 | Incentive Marketing, Inc. | $ 250.00 |
| DDD | 1 | Jennifer Gregory | $ 3,000.00 |
| DDD | 1 | JF Ahren Co. | $ 1,000.00 |
| DDD | 1 | JP Morgan Chase | $ 37,856.74 |
| DDD | 1 | Knight Design LLC | $ 36.67 |
| DDD | 1 | Kollath & Associates CPA | $ 6,000.00 |
| DDD | 1 | Liquor Control bd | $ 1,397.00 |
| DDD | 1 | Marc Piscotty Photography, LLC | $ 4,102.54 |
| DDD | 1 | Oregon Tilth | $ 577.10 |
| DDD | 1 | Pellitteri Waste Systems, Inc | $ 440.00 |
| DDD | 1 | QEMS | $ 1,710.00 |
| DDD | 1 | QPS Employment Group | $ 1,072.89 |
| DDD | 1 | Serralles USA, LLC | $ 109,142.00 |
| DDD | 1 | Shanghai Labbrand Enterprise | $ 15,000.00 |
| DDD | 1 | Starion Financial/Bank | $ 1,308.80 |
| DDD | 1 | Total Water | $ 49,200.00 |
| DDD | 1 | Vanguard Luxury Brands | $ 8,872.70 |
| DDD | 1 | Watertech of America | $ 1,784.32 |
| DDD | 1 | WI Dept. of Revenue | $ 10.00 |
| DDS | 3 | Uline Shipping Supplies | $ 189.08 |
| DDS | 3 | WI Department of Safety | $ 200.00 |
| DDS | 3 | Michael Best & Friedrich LLP | $ 1,577.50 |

1/2

**SCHEDULE I**   **AMENDED**

**REMAINING CLAIMS**

| | | | | |
|---|---|---|---|---|
| DDS | 3 | Neider & Boucher, S.C. | $ | 5,038.25 |
| DDS | 3 | Schneider National | $ | 5,155.00 |
| DDS | 3 | LIS Logistics | $ | 7,613.27 |
| | | | $ | 292,911.42 |
| | | | | |
| DDS | 4 | Serralles USA, LLC | $ | 5,135,913.31 |
| | | | | |
| | | | | |
| **DISPUTED** | | | **DISPUTED** | |
| DDD/DDS | 1 and 3 | Anchor Hocking Specialty Glass | $ | 184,105.02 |
| DDS | 3 | Lush Life Productions | $ | 27,000.93 |
| | | | $ | 211,105.95 |